**PERSONS FOR FREE SPEECH AT SAC, Anne Else, Appellants,**

v.

**UNITED STATES AIR FORCE, Col. John R. McKone, Maj. Gary Trout, in their official capacities, Appellees.**

No. 81–1608.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 9, 1981.

Decided April 28, 1982.

---

Michael D. Gooch, Papillion, Neb., on brief, for appellants.

Thomas D. Thalken, U. S. Atty. for the District of Neb., and David A. Kubichek, Asst. U. S. Atty., Omaha, Neb., and Gary Krajewski, Legal Intern, on brief, for appellees.

Before LAY, Chief Judge, and HEANEY, BRIGHT, ROSS, STEPHENSON,* HENLEY, McMILLIAN and ARNOLD, Circuit Judges, en banc.

ROSS, Circuit Judge.

Persons for Free Speech at SAC and Anne Else, appellants, appeal an order of the district court [1] which held that the United States Air Force could constitutionally refuse to allow appellants to participate in the annual open house held at Offutt Air Force Base near Bellevue, Nebraska. We affirm.

*I. Background*

Offutt Air Force Base (OAFB) is a military installation which, among other things, serves as the headquarters for the Strategic Air Command. OAFB is a closed base and entry by nonmilitary persons requires the advance permission of the base commander. The base is entirely enclosed by a fence and guards are posted at each entrance.

OAFB holds an annual open house and on that day members of the public are allowed to enter certain designated areas of the base. An open house has been held for at least the past six years and has been attended by as many as 250,000 people. The open house includes aerial demonstrations, static displays of aircraft and military equipment, military bands and drill teams, and information and recruiting booths manned by the Air Force, Navy, Marine Corps and Coast Guard. Some nonmilitary organizations are also allowed to participate and are assigned booths at the open house. The nonmilitary groups include current defense contractors, local public service organizations and public safety concerns.

The 1981 open house was scheduled for June 14, 1981, and the operations plan for the open house stated the event would be used "to show the community the relationship between national objectives and the missions of various Offutt organizations."

The plan also noted that the open house would be used as a "favorable environment" for recruitment. By letter dated May 21, 1981, the appellants requested permission to participate in the open house "to present an alternative to the extremely dangerous and costly arms race." Appellants' amended complaint states that they "seek to speak to the propriety of nuclear proliferation, bilateral disarmament, the conversion of the weapons of war to instruments of peace, and the very existence of OAFB in our community." Appellants' letter stated that they were willing to comply with time, place and manner requirements and their tentative plans for participation included a slide show, clowns, theatre, leafleting, musical songs and peace literature.

By letter dated May 29, 1981, the base commander denied appellants' request to participate, stating that "[y]our organization's proposed activities would not be in keeping with the purpose of the Open House program."

On June 11, 1981, the appellants sought declaratory and injunctive relief in federal district court. Following a hearing the district court on June 12th denied appellants' request for a preliminary injunction allowing them to participate in the open house.

On June 13, 1981, Chief Judge Donald P. Lay of this court held a hearing on appellants' expedited appeal. Chief Judge Lay convened a three-judge court by telephone, the other judges included were Judge Gerald W. Heaney and myself. Later on June 13, 1981, Chief Judge Lay issued an order which held, in pertinent part:

> In view of the time element and the limited record this court finds it would be improvident to grant injunctive relief at this time.
>
> In so ruling, this court recognizes that at issue here is not only the immediate relief for plaintiffs to appear at the Open House scheduled for tomorrow, June 14,

---

* Judge Stephenson took senior status effective April 1, 1982. Prior to that date he heard oral arguments in this case and concurred in the majority opinion.

1. The Honorable Albert G. Schatz, United States District Judge for the District of Nebraska.

1981, to exercise their alleged right to free speech, but also the more basic underlying challenge to the Air Force Regulations which provide a total ban to any kind of political speech on the Air Base at that time or any other time. In denying relief, this court does not in any way pass on the merits of the claim nor do we pass on the probability of success of the plaintiffs to their claim. * * *

In view of this order we remand to the district court, with directions that plaintiffs' complaint be amended to reflect the challenge against the particular Air Force Regulations involved. This we deem necessary to avoid the issue of mootness as it might relate to the occurrence of a past event, to-wit, the Open House, scheduled tomorrow at the Air Base. The complaint should be amended within two weeks and the government should file its response in the district court within a reasonable time, not to exceed fourteen days. The parties thereafter should be given a reasonable time to supplement the record with additional evidence, including

(a) evidence as to what specific organizations had or may have booths at the Open House and what specific signs or literature were or may be displayed or distributed;

(b) evidence as to what specific literature and other speech forms the plaintiffs attempted to distribute or display at the Air Force Open House of June 14, 1981.

The district court within 60 days of this order, assuming the record is complete, should thereafter enter its final judgment. The court is requested to specifically address the issues as to: (a) whether the defendants have waived their right to ban all forms of free speech during public demonstrations such as the Open House; and (b) whether defendants have discriminated against the plaintiffs in view of the recognition given to other organizations to have booths and distribute literature; and (c) whether plaintiffs' distribution of literature vis-a-vis public speeches and demonstrations may be banned without a finding by the Command of the Air

Force that it would disrupt the discipline and morale of its troops. In addition to the above, the court should, of course, address any other issues raised by the parties.

On the evening of June 13th, the appellants petitioned the United States Supreme Court for a preliminary injunction. The petition was denied by Justice Blackmun.

## II. The Decision of the District Court

On August 3, 1981, the district court held a bench trial and on September 23, 1981, issued its memorandum opinion.

The findings of fact by the district court outline four types of groups who had been allowed to maintain booths and distribute literature at the 1981 open house:

The first group included organizations that provided support services to those in attendance at the open house. For the most part, they operated refreshment concession stands and first aid stations. The second group was comprised of organizations that play an integral role in the function of the military, such as the various military service outfits attached to OAFB, recruiters, and defense contractors. Among the third group were several organizations indicative of community involvement by OAFB personnel in the City of Bellevue, Nebraska, such as the Chamber of Commerce and Big Brothers/Big Sisters. The fourth and final category of participants was comprised of safety-oriented concerns. For example, the Coast Guard handed out material on safe boating, and the Nebraska Highway Patrol distributed safe driving manuals.

All the literature distributed by the various groups at the open house was reviewed by the district court. The district court found that the literature distributed by military service branches was "for the most part designed to serve recruiting needs." As for the literature distributed by three defense contractors the court found that it "was quite narrowly confined to present facts and figures about aircraft and weapon systems that they were currently supplying

to the Air Force * * * [and] they were not allowed to distribute literature promoting their consumer products or public relations material regarding their corporations." The community groups "disseminated information promoting their various activities." The Chamber of Commerce "distributed tourist-oriented pamphlets * * *." Other community groups who participated included such groups as Big Brothers/Big Sisters, Volunteers in Diversion and Advocacy [a youthful offenders program], and a model airplane club.[2]

The district court also reviewed the literature which the appellants wanted to distribute at the open house. The literature reviewed included a reprint of a lecture by former World Bank President Robert S. McNamara, a flyer advertising a CBS documentary on nuclear warfare, a flyer stating "it will be a great day when our schools get all the money they need and the air force has to hold a bake sale to buy a bomber" and copies of an essay on the nuclear arms race and Christian morality. There is no evidence that the Air Force was given appellants' literature to review prior to the denial of a booth at the open house. And as noted by the district court, "there was no finding by the Air Force command that the literature sought to be distributed by the plaintiffs presented any threat to the loyalty, discipline, or morale of the troops stationed at OAFB."[3]

In his conclusions of law, the district court judge rejected appellants' claim that the open house created a "temporary public forum." In so doing, Judge Schatz relied on the Supreme Court's decision in *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976). The district court then, as requested by this court, reviewed Air Force Regulation 190–5 ("Air Force Participation in Public Events") and found the regulation to be a permissible subject matter regulation which had been "objectively and even handedly administered." Judge Schatz emphasized that appellants had not shown "that any other political or ideological organization with views presumably more favorable to OAFB's military mission was allowed to participate in the open house event." The district court also held, based on *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) that the Air Force need only provide a rational basis for excluding certain groups because the base is not a public forum. Judge Schatz held that the basic premise behind the Air Force regulation is the same here as in *Greer v. Spock* "to-wit, keeping official military activities on the base completely free of entanglement with partisan political or ideological controversies of any kind."

The district court rejected appellants' contention that the various military outfits and defense contractors were at the open

**2.** There is also evidence in the record that a base sanctioned Black Awareness program was allowed to share a booth with the base's explorer scout troop. In the words of the base commander the program "was set up by a group of volunteers on Base, members of our Social Actions office on Base."

**3.** The district court also supplemented the record with findings concerning actions taken toward certain of appellants' members at the open house.

The OAFB's chief of security had instructed gate sentries that civilians with signs, buttons or clothing that were "political" or "ideological" in nature should not be allowed on the base. One of appellants' members was denied permission to enter the base because his T-shirt contained the slogan "No Nukes in the Breadbasket." Another member was permitted to enter the base after a decision by the chief of security that a T-shirt with the slogan "Jobs,

Not Bombs" was not "sufficiently political." Other members of appellants' organization were denied permission to enter until they removed buttons or messages taped to their clothing. Appellants' amended complaint which was filed following the open house did not raise as an issue the restriction placed on "clothing" messages, rather appellants sought participation in the open house as a group. However, we will address these restrictions in footnote 9 of this opinion.

The district court also found that several members of appellants' group were removed from the base chapel after attending a Roman Catholic Mass "because it was not part of the area open to the public that day * * *." "Ban and Bar" letters were issued to these persons and they were escorted off base.

We will also address this action in footnote 9 of this opinion.

house to convey a political or ideological viewpoint and thus appellants should be given equal access to express their markedly alternative views. The district court held that although the terms "political" and "ideological" do not lend themselves to precise definitions, he believed that under a "practical, common sense" definition the "blandly informative displays" of the military service branches and defense contractors could not be considered political or ideological.

In considering the literature the appellants wished to distribute, the district court held "that the entanglement rationale * * * is just as valid and meaningful with regard to political and ideological speech in written form as it is with regard to that type of speech in verbal form."

### III. Public Forum

In *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) the Supreme Court upheld the constitutionality of a ban on political speeches at a military base. A key determination in that case was that the military base was not a public forum. The Supreme Court held that "[t]he notion that federal military reservations, like municipal streets and parks, have traditionally served as a place for free public assembly and communication of thoughts by private citizens is * * * historically and constitutionally false." *Id.* at 838, 96 S.Ct. at 1217.[4]

The appellants contend that although OAFB may be a closed base and thus not a public forum on every other day of the year, the annual open house creates a "temporary public forum." A public forum is created, appellants argue, by inviting the public and conveying to them a message that appellants find objectionable, i.e., here is our mission, as a community you should like and appreciate us. Thus, appellants believe that the Air Force must "risk" a response to the message in the forum. Due to the Air Force's alleged "speech," appellants assert that there has been an abandonment of both the Air Force's primary mission and its claimed neutrality on ideological issues resulting in abandonment of a normally nonpublic forum.

As noted by the district court, there is no case law which supports the concept of a "temporary public forum." The Supreme Court has rested its "public forum" analysis on considerations of the historical and traditional uses of the relevant government property. *See United States Postal Service v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 117–120, 101 S.Ct. 2676, 2679, 69 L.Ed.2d 517 (1981) (mail boxes); *Greer v. Spock, supra*, 424 U.S. at 838, 96 S.Ct. at 1217 (military base); *Adderley v. Florida*, 385 U.S. 39, 41, 87 S.Ct. 242, 244, 17 L.Ed.2d 149 (1966) (jail). The question, therefore, is whether the open house is such a deviation from the historical and traditional uses of OAFB so as to create a public forum. We hold it is not.

In *Greer v. Spock, supra*, 424 U.S. at 836, 96 S.Ct. at 1216, the Supreme Court rejected "*the principle that whenever members of the public are permitted freely to visit a place owned or operated by the Government, then that place becomes a 'public forum' for purposes of the First Amendment.*" (Emphasis supplied.) The Supreme Court also discussed the case of *Flower v. United States*, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972) in which the conviction of a civilian for leafleting on a street within a military base was summarily reversed. The Court in *Greer v. Spock* distinguished the *Flower* case as one involving an open street, which was similar to all others in the city and in which the military had abandoned any special interests in civilian traffic. *Greer v. Spock, supra*, 424 U.S. at 835, 96 S.Ct. at 1216.

■ We reject any argument that the size of the civilian audience which chose to attend the open house reflects an abandonment of military control over the base property. The detailed operations plan for the

---

**4.** The Supreme Court recently reaffirmed its adherence to the "public forum" distinction in *United States Postal Service v. Council of* *Greenburgh Civic Ass'ns*, 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981).

event and the concerns it reflects for security, traffic flow and personnel are inconsistent with a one-day abandonment.

■ The appellants also believe the "speech" in which the Air Force was involved created a public forum. Apparently, appellants believe that fostering good community relations and seeking public approval of their mission is nontraditional speech through which the military abandons control over OAFB. We disagree.

While the primary mission of the Air Force may be the defense of the United States, this does not mean that good relations between a military base and the community in which it exists is not legitimately supportive of that mission. In *Greer v. Spock, supra,* 424 U.S. at 838 n.10, 96 S.Ct. at 1217 n.10, the Court noted that:

> The fact that other civilian speakers and entertainers had sometimes been invited to appear at Fort Dix did not of itself serve to convert Fort Dix into a public forum or to confer upon political candidates a First or Fifth Amendment right to conduct their campaigns there. The decision of the military authorities that a civilian lecture on drug abuse, a religious service by a visiting preacher at the base chapel, or a rock musical concert would be supportive of the military mission of Fort Dix surely did not leave the authorities powerless thereafter to prevent any civilian from entering Fort Dix to speak on any subject whatever.

■ We have no problem characterizing a military base's open house as "supportive of the military mission."[5] While not decisive to our decision, it is relevant that Air Force Regulation 190–5 sanctions and even encourages the type of "speech" that occurs at the open house.[6] Air Force Regulation 190–5 entitled "Air Force Participation in Public Events" provides:

a. Participation is authorized, encouraged, and essential, within the limits defined in this regulation, to:

(1) Inform the public on Air Force preparedness and promote national security;

(2) Demonstrate US partnership with allies in collective security;

(3) Develop public understanding of the Air Force mission;

(4) Assist Air Force personnel procurement programs; and

(5) Aid community relations. Commanders at all levels will give positive emphasis to the importance of good community relations in the execution of their missions.

AFR 190–5(3)(a). The regulation's definition of "community relations" is also noteworthy:

j. Community Relations. The relationship between the base and civilian community.

(1) *Community Relations Area* —the geographical area wherein Air Force facilities and/or personnel have a social or economic impact on the populace.

(2) *Community Relations Program* —that command function which evaluates public attitudes, *identifies the mission of a military organization with the public interest, and executes a program of action to earn public understanding and acceptance.* Community relations programs are conducted at all levels of command, both in the United States and overseas, by military organizations having a community relations area of responsibility. Community relations programs include, but are not limited to such activities as:

(a) Air Force participation in international, national, regional, state, and local public events.

(b) *Installation open houses* and tours and orientation tours for distinguished civilians.

---

5. The term "supportive of the military mission" could admittedly be used to justify almost any "speech" by the military. But to condone a military base's open house as within the traditional sphere of military activities is not to say that the courts (and other branches of the government) would approve speech by the military which is clearly outside traditional military affairs.

6. In Part V of this opinion, we have rejected arguments that the regulation is unconstitutional on its face or in its application.

(c) Humanitarian acts.

(d) Cooperation with government officials and community leaders.

(e) Encouragement of Air Force personnel and their dependents to participate in all appropriate aspects of local community life.

AFR 190–5(2)(j) (emphasis supplied).

 Our holding is simply that the open house is within the range of traditional military activities and thus no public forum was created. That appellants believe that the Air Force's "message" was also ideological does not change this result. As summarized by the district court, the "message" objected to is "that a high technology, nuclear-oriented military system is a viable way for the United States to conduct itself in world affairs." But to argue that the "ideological message" appellants "heard" at the open house somehow transformed OAFB into a public forum and into a nuclear advocate is to ignore the traditional role of the military under our Constitution.

 In *Parker v. Levy*, 417 U.S. 733, 751, 94 S.Ct. 2547, 2559, 41 L.Ed.2d 439 (1974) the Supreme Court noted that:

The military establishment is subject to the control of the civilian Commander in Chief and the civilian departmental heads under him, and its function is to carry out the policies made by those civilian superiors.

Civilians, our President and Congress make the "ideological" decisions for the military. Where the military stands today may be an ideological controversy and even more so where the military will be tomorrow. But the debate on such controversies is for civilian forums not military bases.

To the extent that the Air Force's display of its current state in terms of weapons systems and aircraft reflects an "ideology," it is an ideology which is developed and controlled under our Constitution by civilians. It is our elected officials who develop the "ideology" which the Air Force is *required* to carry out. The decisions on the military's current and future state do not historically or traditionally occur on military bases.

 Reiterated in *Greer v. Spock* is the principle that " '[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.' " *Greer v. Spock, supra*, 424 U.S. at 836, 96 S.Ct. at 1216, quoting *Adderley v. Florida*, 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149 (1966). This military base and others are "lawfully dedicated" to carrying out the decisions of our civilian government. The argument that the military has abandoned its ideological neutrality is based on the false premise that the military itself can pick and choose under our Constitution the "ideology" it wishes to carry out. No public forum can arise from the "ideological" reflection of the current state of the military because historically, traditionally and constitutionally this "reflection" is mandated by the civilian sector.

 While we believe that the military may have been involved in "speech" in pursuing its community relations effort, we refuse to label the "ideological message" the appellants heard as the military's "speech." If there is "speech" involved in the "ideological message" it is attributable to our civilian government. If the label "government speech" were applied to this message we would still hold that there is a legitimate governmental interest in the "speech" and no public forum is created. *See generally*: Shiffrin, *Government Speech*, 27 UCLA L.Rev. 565 (1980). The governmental interest which is served by the open house, beyond any "ideological message," is that the government is showing its citizens, who pay for the military, how it is spending their money.

As Justice Rehnquist emphasized in *United States Postal Service v. Council of Greenburgh Civic Associations, supra*, 453 U.S. at 130 n.6, 101 S.Ct. at 2685 n.6:

Justice Brennan's analysis assumes that simply because an instrumentality "is used for the communication of ideas or information," it thereby becomes a public forum. Our cases provide no support for such a sweeping proposition. Certainly, a

bulletin board in a cafeteria at Fort Dix is "specifically used for the communication of information and ideas," but such a bulletin board is no more a "public forum" than are the street corners and parking lots found not to be so at the same military base. *Greer v. Spock*, 424 U.S. 828 [96 S.Ct. 1211, 47 L.Ed.2d 505] (1976). Likewise, the advertising space made available in public transportation in the City of Shaker Heights is "specifically used for the communication of information and ideas," but that fact alone was not sufficient to transform that space into a "public forum" for First Amendment purposes. *Lehman v. City of Shaker Heights*, 418 U.S. 298 [94 S.Ct. 2714, 41 L.Ed.2d 770] (1974). In fact Justice Blackmun recognized in *Lehman* that: "Were we to hold to the contrary, display cases in public hospitals, libraries, office buildings, military compounds, and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician. This the Constitution does not require." *Id.*, at 304, 94 S.Ct. at 2717.

### IV. Equal Protection

The appellants argue that by allowing other civilian organizations to obtain booths at the open house while denying their request for a booth is a violation of their right to equal protection of the law.

In *United States Postal Service v. Council of Greenburgh Civic Associations, supra,* 453 U.S. at 131 n.7, 101 S.Ct. 2686 n.7, the Supreme Court stated that:

What we hold is the principle reiterated by cases such as *Adderley v. Florida*, 385 U.S. 39 [87 S.Ct. 242, 17 L.Ed.2d 149] (1966), and *Greer v. Spock*, 424 U.S. 828 [96 S.Ct. 1211, 47 L.Ed.2d 505] (1976), that property owned or controlled by the government which is *not* a public forum may be subject to a prohibition of speech, leafleting, picketing, or other forms of

communication without running afoul of the First Amendment. Admittedly, the government must act reasonably in imposing such restrictions, *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 130–131 [97 S.Ct. 2532, 2540, 53 L.Ed.2d 629] (1977), and the prohibition must be content-neutral.

In *Jones v. North Carolina Prisoners' Labor Union* the Court upheld the discretionary decision of prison officials to bar the operation of a prisoners' union within a state prison while at the same time allowing such groups as Alcoholics Anonymous and the Jaycees to operate within the prison.[7] The Supreme Court held that:

It is precisely in matters such as this, the decision as to which of many groups should be allowed to operate within the prison walls, where, confronted with claims based on the Equal Protection Clause, the courts should allow the prison administrators the full latitude of discretion, unless it can be firmly stated that the two groups are so similar that discretion has been abused.

*Id.* at 136, 97 S.Ct. at 2543.

The deference the courts should give prison administrators' decisions is also viable to a lesser degree when dealing with the discretion to be afforded to a military base commander, and the Supreme Court has recognized the historical basis for such discretion in *Cafeteria & Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 892–93, 81 S.Ct. 1743, 1747, 6 L.Ed.2d 1230 (1961). It relied in part on the following quotation:

"It is well settled that a Post Commander can, under the authority conferred on him by statutes and regulations, in his discretion, exclude private persons and property therefrom, or admit them under such restrictions as he may prescribe in the interest of good order and military discipline (1918 Dig.Op.J.A.G. 267 and cases cited)." JAGA 1925/680.44, 6 October 1925.

---

**7.** While we dislike the comparison of military bases to prisons, we note that in *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), Justice

Rehnquist used the military base in *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) as a comparison to the state prison in his analysis.

*Id.* at 893, 81 S.Ct. at 1747. *See also Rostker v. Goldberg,* 453 U.S. 57, 59–62, 101 S.Ct. 2646, 2649–2650, 69 L.Ed.2d 478 (1981).

The reason given by the base commander for denying appellants' request for a booth was "[y]our organization's proposed activities would not be in keeping with the purpose of the Open House program." The purpose of the open house was, according to the operations plan, "to show the community the relationship between national objectives and the missions of various Offutt organizations."

The distinction made between other civilian groups and appellants' organization is reasonable in view of the purpose of the open house.

Many of the "civilian" groups which were given booths were, in fact, base-sanctioned, private organizations composed mostly of base personnel and their dependents. The record indicates that base-sanctioned organizations included the Explorer Scouts, Big Brothers/Big Sisters and the Black Awareness Program. The civilian groups who received booths but were not apparently "base-sanctioned" included the Bellevue Chamber of Commerce, defense contractors and safety groups.[8] The Chamber of Commerce handed out literature on the Bellevue, Nebraska, area and information on Fontenelle Forest, a nature preserve in Bellevue. The Chamber of Commerce's participation is reasonably related to the purpose of the open house, i.e., community relations. The defense contractors provided literature and information about aircraft and weapon systems *currently* being supplied to the Air Force. The display and operation of aircraft was quite obviously a major part of the open house program. That the Air Force allowed contractors to provide, in the words of the district court, "blandly informative displays," was also reasonably related to the open house pro-

gram. One key factor which distinguishes the defense contractors from the appellants' organization is that these corporations are heavily involved in day-to-day activity on the base. The record reflects that there is a close working relationship between the Air Force and these corporations in the supplying and servicing of equipment. It is of considerable importance to us that the contractors were strictly limited to the display of and information on equipment being currently supplied to the Air Force. In fact, one contractor who was involved with a *proposed* weapon system did not participate.

■ With the exception of the Chamber of Commerce and the safety-oriented groups, the remaining "civilian" groups were associated with the every day life and work at OAFB. Under *Jones v. North Carolina Prisoners' Labor Union, supra,* 433 U.S. at 136, 97 S.Ct. at 2543, it cannot "be firmly stated that the two groups [appellants versus the nonmilitary participants] are so similar that [the base commander's] discretion has been abused." We hold that the base commander's decision to allow only civilian groups whose activities were "in keeping with the purpose of the open house," which purpose was to foster good community relations, was not an abuse of discretion.

■ There are "narrow circumstances" in which the government may regulate the "subject matter" of speech. *See Consolidated Edison v. Public Service Commission,* 447 U.S. 530, 538, 100 S.Ct. 2326, 2333, 65 L.Ed.2d 319 (1980). In *Jones v. North Carolina Prisoners' Union, supra,* 433 U.S. at 134, 97 S.Ct. at 2542, the Supreme Court allowed prison officials to limit access to the prison to groups which "were seen as serving a rehabilitative purpose, working in harmony with the goals and desires of the prison administrators, and [the groups] had

8. Appellants argue that they are similar to all other nonmilitary invitees to the open house. However, the appellants focus on their alleged similarity to the defense contractors. Appellants have not specifically argued that their organization is similar to the safety-oriented

groups, such as the Nebraska Highway Patrol and the Civil Air Patrol. But we note that appellants would be hard-pressed to show a similarity in the subject matter of their group and the safety-oriented groups.

been determined not to pose any threat to the order or security of the institution." Similarly, we hold that the base commander could limit access to those groups that he viewed as related to the purpose of the open house.

The record also reflects that Colonel McKone, the base commander, believed that there would be problems with keeping order during the open house if appellants were allowed to participate. Colonel McKone testified that:

A. Well, as the Installation Commander on the Base, I am also the convening authority for all the court martial actions, also you might say the Chief of the Security Police on the Base, I have the responsibility of maintaining the safety and security of everybody on that installation. During the period of an Open House like this, I have to consider that we are to have anywhere from 150,000 to maybe a quarter of a million people on the Base at one particular time. If a group like this was approved to come on the Base and there were other people who violently disagreed with that group, I would, in turn, I'm sure, have to protect this group from those other individuals. I had to consider that. Reverend Rupiper

[a member of appellants' organization] mentioned during his discussion that this particular group when they were just standing outside the gates and praying was continually harassed. This was certainly not an organized attempt on our part, but the feeling of the people that live and work on the Base. Certainly, this group has not been popular with many people on the Base and I have to consider what would happen by bringing them on the Base, letting them go do their thing, unquote.

The Supreme Court in *Jones v. North Carolina Prisoners' Labor Union* specifically held that in a nonpublic forum "these reasonable beliefs * * * are sufficient." *Id.* at 136, 97 S.Ct. at 2543. The Court also noted that "[t]he District Court's further requirement of a demonstrable showing that the Union was in fact harmful is inconsistent with the deference federal courts should pay to the informed discretion of prison officials." As indicated earlier, we believe this same deference must be afforded to a base commander. And the base commander may limit access to those groups whose "subject matter" is consistent with the purposes of the open house.[9]

**9.** While we hold that the base commander's reasonable beliefs are sufficient to deny appellants' request to participate as a group in the open house, we are compelled to note our concern with attempting to regulate "clothing" messages of individual persons entering the open house. *See* footnote 3, *supra.*

In *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) the Supreme Court held that the first amendment protected the right of high school students to wear black armbands to protest America's involvement in Vietnam. The Court stated that this symbolic speech is "closely akin to 'pure speech' which, we have repeatedly held, is entitled to comprehensive protection under the First Amendment." *Id.* at 505–06, 89 S.Ct. at 735–36 (citations omitted). But it was also emphasized that the case factually "was entirely divorced from actually or potentially disruptive conduct by those participating in" the speech, *id.* at 505, 89 S.Ct. at 735, and the case did "not concern aggressive, disruptive action or even group demonstrations." *Id.* at 508, 89 S.Ct. at 737.

Based on *Tinker* we do not believe that the Air Force can constitutionally regulate "cloth-

ing" speech of individual members of the general public, including members of appellants' organization. On the day of the open house appellants did demonstrate outside the front gate of the base as a group. But there was no evidence appellants attempted to enter the base as a group or entered the base individually and later attempted to stage a group demonstration. This type of group activity could be restricted based on the purpose of the open house and the reasonable beliefs of the base commander that there would be a disturbance.

While we believe individual "clothing" messages should be allowed, *Tinker* also stands for the proposition that "facts which might reasonably have led [the base commander] to forecast substantial disruption of or material interference with [the open house] activities" would give to him the discretion "to deny [an individual's] form of expression." *Id.* at 514, 89 S.Ct. at 740. We also note that it is within the base commander's discretion to admit or deny admittance to the open house to people who have previously been issued valid "ban and bar" letters, whether issued that day or at some earlier time. However, as indicated in footnote 3, *supra*, the appellants' amended complaint

### V. Air Force Regulation 190–5

This regulation entitled "Air Force Participation in Public Events" was cited by the base commander in his letter which denied appellants' request to participate in the open house. The Air Force has argued, however, that their refusal to allow appellants' participation was also justified under the regulation. We agree that the regulation does provide support for the Air Force's refusal, although the denial of appellants' request to participate can be upheld, as indicated in Part IV of this opinion, based on the discretion of the base commander and the purpose of the open house.

The Air Force argues that the appellants' organization is an "ideological" group which must be barred from the base under Section (3)(d) of AFR 190–5. That provision of the regulation provides:

> d. Participation and cooperation MUST NOT directly or indirectly endorse or selectively benefit or favor or appear to endorse or selectively benefit or favor any private individual, group, corporation (whether for profit or nonprofit), sect, quasi-religious or ideological movement, fraternal organization, political organization, or commercial venture, or be associated with the solicitation of votes in a political election.

Appellants' brief claims that the regulation is unconstitutional on its face, however, at oral argument appellants also asserted unconstitutional application of the regulation.

The argument that the regulation is unconstitutional on its face is basically the same argument raised on the public forum issue. The argument is that because the military has engaged in "speech" on an ideological issue, it can not deny equal access to appellants based on a desire to stay free of "entanglement" with ideological issues.

In Part III of this opinion we recognized that the military's community relations activities may be classified as "speech," but we rejected the argument that the military was engaged in "ideological" speech. However, that the military itself may "speak" through its community relations activities does not destroy the governmental interest served in forbidding the military from becoming entangled with nonmilitary "ideological movements." As the regulation explains:

> (1) Included among the organizations which may not be selectively benefited or favored are: Religious and sectarian groups; fraternal organizations, such as the Knights of Columbus, Loyal Order of the Moose, or B'nai B'rith; and quasi-religious or ideological movements or organizations, such as Moral Rearmament, "Sing Out," and "Up with People."

To us there is a vast difference between allowing the military to "speak" in an effort to foster base/community relations and allowing the military to throw the weight of its resources behind a nonmilitary ideological movement. The "entanglement" rationale we believe is still viable when dealing with military endorsement or support of nonmilitary ideological movements. The district court found that "no other easily identifiable political or ideological group even asked to participate in the 1981 open house * * *." And we agree with the district court that the rationale of *Greer v. Spock* regarding noninvolvement of the military in partisan politics is also applicable to noninvolvement of the military in civilian ideological movements. In his concurring opinion in *Greer v. Spock*, Justice Powell emphasized that involvement of the military in politics could undermine public confidence in civilian control of the military, a constitutionally mandated requirement. *Greer v. Spock, supra,* 424 U.S. at 845–46, 96 S.Ct. at 1220–21. The same can be said

did not request any relief as to these acts and therefore it was unnecessary for the district court to provide individual relief.

We do wish to emphasize that the arbitrary exercise of this discretion can not be condoned. The issuance of "ban and bar" letters to those

who attended Mass at the base chapel is invalid based on the record before us. There is no evidence that the base chapel was marked "off limits" or that these persons engaged in any disruption during the Mass.

for barring military involvement in civilian ideological controversies.

■ As emphasized in Part III of this opinion the debate on controversies regarding our military is for civilian forums not military bases. The military can obviously tell its civilian leaders what "ideological" decisions it favors. But what the military cannot do is influence public opinion on those decisions by endorsing or supporting civilian groups whose ideology they may favor. This would "entangle" the military in controversies that must be decided under our Constitution by civilian officials and it would definitely undermine public confidence in civilian control of the military. An analogy may be helpful.

Many would characterize the controversy regarding whether to register women for the draft as an "ideological" controversy which affects the military. The military may tell the President and Congress what its opinion is on the controversy; but Congress was the decisionmaker on the controversy. If the military allowed on base civilian "ideological" groups whose views on the controversy the military might favor, the military would be "entangling" itself in the controversy to a degree inappropriate to a "civilian-run" military. It is quite obvious that if the military does not allow "one side" of the controversy on base, it has no obligation to allow the "other side."

■ We also reject appellants' contention that the regulation was unconstitutionally applied, in that defense contractors were allowed booths while appellants were not. To characterize the defense contractors' displays as "ideological" is to ignore the fact that they were only showing the "current state" of the Air Force. The contractors were not at the open house to debate the current or future state of the military but rather to show the current state.

If there is an "ideology" present in the current state of the Air Force's equipment, it is an ideology imposed by the decisions of our civilian government. To attempt to label the defense contractors' displays as an "ideological movement" under the regula-

tion is to distort the fact that defense contractors do not "choose" how the military will be equipped.

We hold that the regulation has been consistently and evenhandedly applied as to "ideological movements" and it is thus constitutional as applied as well as on its face.

## VI. Distribution of Literature

■ After being denied a booth at the open house, appellants sought permission to distribute literature and leaflets at the open house. Apparently the Air Force did not review or evaluate this literature.

The district court found that the ban on distribution of literature was consistent with the policy behind Air Force Regulation 190–5, that is, noninvolvement of the military in ideological movements. We agree with the district court but add the following comments:

The initial request for participation by appellants included "leafleting" and "peace literature" among their activities. To deny appellants' request for a booth quite obviously was a denial of any request to leaflet throughout the crowd. And there is no evidence that any other nonmilitary group was allowed to distribute any literature outside of a booth. See *Heffron v. International Society for Krisha Consciousness*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). Since OAFB is a "closed base" we must assume that civilians are not normally allowed to come on the base to leaflet, and appellants have offered no evidence that general leafleting is allowed.

## VII. Conclusion

OAFB is not a public forum during its annual open house. The military may legitimately use its property to foster community relations. The Air Force did not violate appellants' right to equal protection when it reasonably limited groups participating in the open house to those whose activities were consistent with the purpose of the open house. Additionally, the Air Force may deny access to appellants because they are an "ideological movement" under Air

Force Regulation 190–5. In summary we note that the Supreme Court has made clear that "[t]he guarantees of the First Amendment have never meant 'that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.'" *Greer v. Spock, supra,* 424 U.S. at 836, 96 S.Ct. at 1216, quoting *Adderley v. Florida, supra,* 385 U.S. at 48, 87 S.Ct. at 247.

The judgment of the district court is affirmed.

BRIGHT, STEPHENSON, HENLEY and ARNOLD, Circuit Judges, concur in this opinion.

HEANEY, Circuit Judge, dissenting, with whom LAY, Chief Judge, and McMILLIAN, Circuit Judge, join.

We agree with the majority that the annual open house at OAFB falls within the traditional sphere of military activities and serves legitimate military purposes.[1] Indeed, the right of the Air Force to hold this event has never been in dispute. The Air Force, however, permits defense contractors and other nonmilitary groups to assemble booths and distribute literature at the open house. Having done so, the issue is whether it can then prohibit the appellants from distributing, in the same manner,[2] literature which is critical of current defense policies.

We cannot accept such selective exclusion for two important reasons. First, the regulation on which the Air Force relied to deny appellants access to the open house was not applied in a content-neutral manner. Civilian groups engaged in ideological and commercial activity were permitted to

participate in the open house to their benefit, while appellants were denied the same opportunity—a discrimination that violates Air Force Regulation (AFR) 190–5 and the First Amendment. Second, and apart from any regulation, the Air Force conducted the open house in a manner which created a public forum, such that it was constitutionally impermissible to deny the appellants the right to distribute literature at the one-day forum. In addition, regardless of whether a public forum was created, the ban on appellants' literature distribution was inconsistent with the "clear danger" standard which the Supreme Court has applied to literature restrictions on military bases. The applicability of the "clear danger" standard, however, is an open question which we need not reach because, in our view, the Air Force's actions are plainly unconstitutional on the two foregoing grounds.

### A.

### AFR 190–5(3)(d) WAS NOT APPLIED IN A CONTENT NEUTRAL MANNER.

AFR 190–5(3)(d) prohibits the Air Force from using its open house to "directly or indirectly endorse or selectively benefit or favor or appear to endorse or selectively benefit or favor any private individual, group, corporation (whether for profit or nonprofit) * * * or ideological movement * * * or commercial venture * * *." The Air Force violated this regulation by permitting defense contractors to participate in and benefit from the open house—in both commercial and ideological capacities—while denying the appellants the same opportunity. This selective exclusion of the

1. We also agree with the majority insofar as it holds that the Air Force cannot constitutionally regulate the speech content of clothing worn at the open house or issue "ban and bar" letters to those who attended Mass at the chapel.

2. The appellants have repeatedly expressed to the Air Force their willingness to submit to reasonable time, place and manner restrictions on the same basis as the other nonmilitary

groups. The appellants also described to the base commander the nature of their literature (prior to the open house) and introduced at trial specific examples of the literature that would be distributed. Neither the base commander nor the district court have contended or found that distribution of such literature would pose a danger to military loyalty, discipline or morale.

appellants is a facial violation of the Air Force regulation.[3]

Moreover, the violation is of a constitutional dimension. Even assuming the open house was not a temporary public forum, any governmental regulation of speech nonetheless must be reasonable and content neutral. *United States Postal Service v. Greenburgh Civic Association,* 453 U.S. 114, 130–131 & n.7, 101 S.Ct. 2676, 2686 & n.7, 69 L.Ed.2d 517, 531–532 & n.7 (1981). Here, AFR 190–5 was not applied in a content-neutral manner. Defense contractors, a vital link in the defense establishment, were permitted to participate in the open house. The appellants, opponents of current defense policies, were denied the same opportunity. Such discrimination on the basis of the content of speech is unconstitutional. The "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Department of Chicago v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972).

The majority does not explicitly address the question of whether the open house selectively benefited the defense contractors in their commercial capacity. It dismisses the commercial aspect by noting that defense contractors provided only "blandly informative displays" of products currently supplied to the Air Force and that the contractors were not permitted to directly promote their consumer goods. This ignores the clear commercial benefit of participating in the open house.

The defense contractors—Boeing, General Electric and McDonnell Douglas—are commercial ventures that supply sophisticated weaponry and equipment to the Air Force. Their presence at the OAFB open house accords them an excellent opportunity to engage in "institutional advertising." [4] Such advertising is aimed at military and civilian officials who participate in defense procurement, as well as everyday consumers who may purchase other products sold by the contractors. In using the open house to foster the image of being competent producers of high technology products, the defense contractors promote themselves to both their military and nonmilitary customers. These commercial benefits may not strike the majority as significant, but they were sufficiently valuable to attract the commercial contractors in the first instance.

The majority also asserts that the defense contractors were not engaged in ideological speech:

> To characterize the defense contractors' displays as "ideological" is to ignore the fact that they were only showing the "current state" of the Air Force. The contractors were not at the open house to debate the current or future state of the military but rather to show the current state.

Id. at 1022.

We cannot accept this view. The defense contractors have a vital interest in promoting public support for defense policies which emphasize high technology products and weapon systems. Moreover, public confidence in the weapon products is crucial to sustaining the policies which lead to such products. In promoting their current products to the general public at the open house, the contractors are unmistakably promoting public support for the defense policies on which those products depend. The linkage between the defense industry and military policymaking was forcefully warned of by President Eisenhower in his farewell address two decades ago:

---

3. We note that the Air Force also violated its regulation by selectively permitting the chamber of commerce and other local nonmilitary groups to participate in and benefit from the open house. Although the participation of such groups is not highly significant, it further underscores the discriminatory character of the Air Force's restriction of appellants' First Amendment rights.

4. "Institutional advertising promotes organizational images, ideas, and political issues." W. Pride & O. Ferrell, *Marketing—Basic Concepts and Decisions,* at 345 (1977). *See also* Stanton, *Fundamentals of Marketing,* at 414 (1981) ("Institutional advertising is designed to create a proper attitude toward the seller and to build goodwill, rather than to sell a specific product or service.").

Until the latest of our world conflicts, the United States had no armaments industry. American makers of plowshares could, with time and as required, make swords as well. But now we can no longer risk emergency improvisation of national defense; we have been compelled to create a permanent armaments industry of vast proportions. Added to this, three and a half million men and women are directly engaged in the defense establishment. We annually spend on military security more than the net income of all United States Corporations.

*This conjunction of an immense military establishment and a large arms industry is new in the American experience. The total influence—economic, political, even spiritual—is felt in every city, every State house, every office of the Federal government.* We recognize the imperative need for this development. Yet we must not fail to comprehend its grave implications. Our toil, resources and livelihood are all involved; so is the very structure of our society.

In the councils of government, we must guard against the acquisition of unwarranted influence, whether sought or unsought, by the military-industrial complex. The potential for the disastrous rise of misplaced power exists and will persist.

*We must never let the weight of this combination endanger our liberties or democratic processes.* We should take nothing for granted. Only an alert and knowledgeable citizenry can compel the proper meshing of the huge industrial and military machinery of defense with our peaceful methods and goals, so that security and liberty may prosper together.

*Public Papers of the President,* 1960–1961, at 1038 (emphasis added).

President Eisenhower's warning foreshadowed the present case. The Air Force sponsors an event that attracts hundreds of thousands from the general public; the defense industry is permitted to join and promote its wares to the public, but those who oppose such products and the policies they rest upon are excluded from the event. Stifling one side of the debate is offensive to the First Amendment, yet the majority approves of such action by concluding that only one side of this debate is ideological. In our view, both the defense industry and its critics bear ideological messages. The Air Force cannot invite the public to the open house and then permit only one side of the national security debate to advance its position.

## B.

## THE OPEN HOUSE CONSTITUTES A PUBLIC FORUM.

Quite apart from any question of compliance with regulations, the Air Force's exclusion of appellants is impermissible under the public forum doctrine. In our view, the Air Force created a temporary public forum at OAFB by conducting the open house in the manner which it did. The Air Force holds its open house at OAFB annually and extends an invitation to the public. The event is attended by well over 100,000 persons each year. Aerial demonstrations, equipment and weaponry displays, and military bands and drill teams are presented for the visitors. Recruiters for the various branches of the armed services are present at the open house. Defense contractors, local public service organizations and public safety groups are permitted to participate and assemble booths to disseminate literature. Refreshment concession stands and other public services are provided on the base. The Air Force diverts equipment and personnel from regular training to instead prepare for the open house. The Air Force's express purpose in staging the open house is "to show the community the relationship between national objectives and the missions of various OAFB organizations."

These factors demonstrate the magnitude of the open house, the large scale of public involvement and the significant participation of nonmilitary groups. From any commonsense perspective, the open house is

plainly a public forum.[5] The primary legal requirement for finding a public forum is also met. In public forum analysis, "the crucial question is whether the [proposed] manner of expression is basically incompatible with the normal activity *of a particular place at a particular time.*" *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972) (emphasis added). *Accord, United States Postal Service v. Greenburgh Civic Association, supra*, 453 U.S. at 129–130 n.6 & 134, 101 S.Ct. at 2685 n.6 & 2687, 69 L.Ed.2d at 530–531 n.6 & 534–536 (Brennan, J., concurring); Note, *The Supreme Court, 1975 Term*, 90 Harv.L.Rev. 56, 155–156 & nn. 28–34 (1976). Here, the appellants' proposed literature booth is clearly compatible with the other activities at OAFB during the open house.[6]

Because the open house constituted a public forum, the government must have compelling reasons to restrict appellant's speech. *See Grayned v. City of Rockford, supra*, 408 U.S. at 116–117, 92 S.Ct. at 2303; *Tinker v. Des Moines Independent School District*, 393 U.S. 503, 506–509, 89 S.Ct. 733, 736–737, 21 L.Ed.2d 731 (1969); *United States v. O'Brien*, 391 U.S. 367, 376–377, 88 S.Ct. 1673, 1678–1679, 20 L.Ed.2d 672 (1968); Note, *The Supreme Court, 1975 Term, supra*, 90 Harv.L.Rev. at 152–154 & nn. 1, 29–34. Neither the majority herein, the district court nor the Air Force claim that there is a compelling governmental interest that justifies prohibiting appellants' speech.

The majority, relying on *Greer v. Spock*, 424 U.S. 828, 838 n.10, 96 S.Ct. 1211, 1217 n.10, 47 L.Ed.2d 505 (1976), asserts that the open house is not a public forum because it "is within the range of traditional military activities." We agree that the open house has now become a tradition. We agree that a primary purpose of the open house is to further current defense policies and, thus, it can be described as a legitimate military activity. The fact that the open house is a traditional military activity, however, does not answer the question of whether it is a public forum. The proper inquiry is not whether the government's use of property is traditional or legitimate but, rather, whether the appellants' proposed use is incompatible with the activities at OAFB during the open house.[7] *Greer* does not suggest otherwise.

---

**5.** We note that a military base does not become a public forum simply because the public is freely admitted to the base. *See Greer v. Spock*, 424 U.S. 828, 836, 96 S.Ct. 1211, 1216, 47 L.Ed.2d 505 (1976). We only conclude that under all the facts and circumstances of this case, the appellants can claim access to OAFB as a public forum for the one day of the open house. We need not reach the question of whether the open house would constitute a public forum if *all* nonmilitary groups were excluded from the event.

**6.** Appellants' speech—if subject to the same restrictions applied to other nonmilitary groups—would not interfere with the civilian visitors. Nor would appellants' literature booths interfere with the aerial demonstrations, equipment and weaponry displays, or military bands and drill teams. Moreover, appellants' activities would not disrupt the leafletting by various military and nonmilitary groups. Finally, the appellants, like the Air Force and the participating defense contractors, seek to address the ideological issues concerning OAFB's relationship to local and national objectives and concerns. The appellants, of course, do not share the Air Force's view of how to best protect our national security; but appellants' speech cannot be considered incompatible with the open house merely because its content conflicts with the Air Force's message. If such an interpretation of incompatibility was adopted, no governmental property would ever be considered a public forum because any proposed speech that the government did not approve of would be incompatible with the government's use of the property.

**7.** The Supreme Court has made it clear that the compatibility question in public forum analysis focuses on the relationship between the speech that is being restricted and the government's use of the public property at the time of the proposed speech. *See United States Postal Service v. Greenburgh Civic Association*, 453 U.S. 114, 129–130 n.6 & 134–136, 101 S.Ct. 2676, 2685 n.6 & 2687–2688, 69 L.Ed.2d 517, 530–531 n.6 & 534–536 (Brennan, J., concurring) (1981); *Greer v. Spock, supra*, 424 U.S. at 837–838 & 843–844, 96 S.Ct. at 1217 & 1220 (Powell, J., concurring); *Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972). *See also* Note, *The Supreme Court, 1975 Term*, 90 Harv.L.Rev. 56, 155–156 & nn. 28–34 (1976).

In *Greer*, the Supreme Court upheld Army regulations which were relied upon to deny political candidates permission to hold a political meeting on a public parking lot at Fort Dix. The Court concluded that the base was not a public forum for the candidates' partisan political speeches because such speeches were fundamentally incompatible with the military's traditional and historical role of training soldiers and remaining politically neutral.[8] *Id.* at 838, 96 S.Ct. at 1217. *See* Note, *The Supreme Court, 1975 Term, supra,* 90 Harv.L.Rev. at 156.

Thus, *Greer* does not create a per se rule that a military base cannot be a public forum under any circumstances. It did hold that, for purposes of partisan speeches on a military base, the public forum doctrine would be construed very narrowly. The Court's analysis, however, was consistent with prior cases that had decided the public forum question by considering all relevant circumstances, including the compatibility of the proposed speech with the government's use of its property. This compatibility analysis was reaffirmed, subsequent to *Greer*, in *United States Postal Service v. Greenburgh Civic Association, supra,* 453 U.S. at 114, 101 S.Ct. at 2676, 69 L.Ed.2d at 517. In that case, the majority, concurring and dissenting opinions all analyzed the public forum question by determining whether the proposed First Amendment exercise was incompatible with the government's use of the public property at the time in controversy. *Id.* 453 U.S. at 129, 130 n.6, 101 S.Ct. at 2685 n.6, 69 L.Ed.2d at 530–531 n.6 (majority opinion); 453 U.S. at 134–136, 101 S.Ct. at 2687–2688, 69 L.

Ed.2d at 534–536 (Brennan, J., concurring); 453 U.S. at 142–143, 101 S.Ct. at 2691–2692, 69 L.Ed.2d at 543–544 (Marshall, J., dissenting).

Moreover, nothing in *Greer* suggests that the appellants' proposed speech at OAFB is incompatible with the military's activities at the open house. In *Greer*, unlike the present case, the plaintiffs sought to speak to soldiers engaged in routine training rather than to the general public at an open house. Indeed, under *Greer* and by any meaningful standard, the appellants' proposed speech activity is plainly compatible with the open house activities as a whole. *See* note 6, *supra.*

The majority also argues that the open house was not a public forum merely because an ideological message was projected by the Air Force. They reason that the Air Force's message, though ideological, reflects an "ideology which is developed and controlled under our Constitution by civilians." *Supra,* at 1017, 1022. Implicit in this reasoning is an admission that the Air Force might well create a public forum if it was projecting its own "military message" rather than a civilian message.

We fail to grasp the logic of the distinction. In either case, it is government speech that is being projected and the impact on the question of whether a public forum is created should be the same. The majority cites to no case in which the validity of military restrictions on speech has turned on the notion that such restrictions were civilian directed. If the government chooses a military base as a forum to

---

**8.** The majority ignores this compatibility analysis in *Greer v. Spock,* 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976). It misreads footnote 10 in *Greer* which states:

The fact that other civilian speakers and entertainers had sometimes been invited to appear at Fort Dix did not of itself serve to convert Fort Dix into a public forum or to confer upon political candidates a First or Fifth Amendment right to conduct their campaigns there. The decision of the military authorities that a civilian lecture on drug abuse, a religious service by a visiting preacher at the base chapel, or a rock musical concert would be supportive of the mili-

tary mission of Fort Dix surely did not leave the authorities powerless thereafter to prevent any civilian from entering Fort Dix to speak on any subject whatever.
424 U.S. at 838 n.10, 96 S.Ct. at 1217 n.10.
In footnote 10 in *Greer,* the Court was merely noting that prior permission for compatible civilian speakers did not mean that incompatible civilian speech activity must be permitted. This compatibility analysis, of course, did not focus on whether the military approved of the content of the speech, but rather on whether the nature of the activity was incompatible with the functioning of the military base. *See* note 6, *supra.*

project an ideological message to the public and in the process creates a public forum, it must expect that those who do not agree with the message will seek to project their own message from the same forum.

## C.

### APPELLANTS' LITERATURE DISTRIBUTION POSES NO DANGER TO MILITARY LOYALTY, MORALE OR DISCIPLINE.

Regardless of whether the open house was a public forum, the Air Force ban on appellants' literature distribution is inconsistent with the "clear danger" standard which the Supreme Court has applied to literature restrictions on military bases. In *Greer v. Spock, supra*, 424 U.S. at 838–840, 96 S.Ct. at 1217–1218, the Supreme Court upheld an Army regulation which required prior approval by a base commander before literature could be distributed on-base. In so holding, the Court "emphasized that [the regulation] does not authorize the Fort Dix authorities to prohibit the distribution of conventional political campaign literature." *Id.* at 840, 96 S.Ct. at 1218. Indeed, the *Greer* Court underscored that under the express terms of the regulation, literature could be ultimately prohibited only when found to pose a *"clear danger to military loyalty, discipline or morale." Id.* (Emphasis added.)

The Court thus distinguished literature distribution from partisan political speeches or rallies, holding that the latter could be uniformly banned from a military base. Although the majority ignores this distinction, the Supreme Court reaffirmed it in *Brown v. Glines*, 444 U.S. 348, 353 n.8, 100 S.Ct. 594, 599 n.8, 62 L.Ed.2d 540 (1979): [9]

We specifically emphasized that the Army regulation at issue in *Greer v. Spock* did "not authorize the [base] au-

thorities to prohibit the distribution of conventional political campaign literature." Thus, our decision to sustain that regulation was distinct from our concomitant decision to uphold another regulation that prevented civilians from using a military base as a forum for the expression of political views. [Citations omitted.]

Read together, *Greer* and *Brown* clearly establish that military restrictions on literature distribution are subject to a different constitutional standard than restrictions on speeches, rallies and the like. The precise standard for reviewing literature restrictions, however, is less clear. In both *Greer* and *Brown*, the Supreme Court repeatedly emphasized that the regulations upheld in those cases would allow the military to prohibit literature only when it posed a "clear danger" to morale, discipline or loyalty. *See Greer v. Spock, supra*, 424 U.S. at 838–840, 96 S.Ct. at 1217, 1218; *Brown v. Glines, supra*, 444 U.S. at 353, 100 S.Ct. at 599. Such strong emphasis may be read as constitutionalizing the "clear danger" standard.

To the extent the "clear danger" standard is a constitutional one, the Air Force plainly has not complied with it. Here, the appellants met with the Air Force prior to the open house and, in requesting permission for a literature booth, described the nature of the literature they intended to distribute. The appellants also expressed their willingness to abide by reasonable time, place and manner restrictions. [10] The Air Force never sought to examine the literature and has never contended that it would pose a danger of any kind to loyalty, discipline or morale. Nor did the district court, after reviewing the actual literature, find any such danger. The Air Force simply banned the appellants' literature distribution while permitting other nonmilitary groups to participate and distribute litera-

---

9. In *Brown v. Glines*, 444 U.S. 348, 355, 100 S.Ct. 594, 600, 62 L.Ed.2d 540 (1979), the Court upheld an Air Force prior approval requirement, again emphasizing that, under the regulation, literature could be *prohibited* only if found to pose a "clear danger" to morale, loyalty or discipline.

10. Appellants have not disputed the Air Force's right to impose reasonable time, place and manner restrictions on the speech of nonmilitary groups at the open house. Nor do we.

ture.[11] The selective exclusion of appellants' literature cannot be justified as being necessary to protect military loyalty, discipline or morale.

We recognize, however, that the "clear danger" standard in *Greer* and *Brown* was an express element of the regulations at issue in those cases and that, in upholding the regulations, the Court did not state that the standard applied broadly as a constitutional limit on military literature restrictions. The scope and applicability of the "clear danger" standard is thus an open question. We need not and do not reach this question because, in our view, the Air Force's actions are unconstitutional on the two grounds previously discussed.

### SUMMARY.

We believe that if the Air Force is going to conduct the open house at OAFB in the manner which it has, it must permit the appellants to participate on the same basis as other nonmilitary groups. We emphasize that we do not contend there is any general right to enter OAFB for the purpose of distributing literature. Nor do we reach the question of whether the appellants could be constitutionally excluded if all nonmilitary groups were excluded from the open house.

The Air Force, however, chose to hold an open house that would attract hundreds of thousands of civilians and chose to permit defense contractors and other nonmilitary groups to participate and distribute leaflets on the base to the general public. By thereafter excluding the appellants from the open house, the Air Force violates its own regulation. Moreover, it violates the First Amendment by applying that regulation in a manner which is not content neutral, and by denying appellants access to a public forum without a compelling justifica-

tion. Finally, the selective exclusion of appellants' literature cannot be justified as being necessary to protect military discipline, loyalty or morale.[12]

The majority, nonetheless, approves of these actions simply because the open house is traditional, serves legitimate purposes and promotes a "civilian ideology." Such a rationale has unsettling implications for the First Amendment. We cannot agree that the First Amendment affords so little protection to free expression by citizens on the property of their government.

---

11. The appellants have never contended that they have a right to distribute their literature at OAFB when it is regularly closed to the public. We need not speculate as to whether a constitutional "clear danger" standard for literature restrictions might apply to such closed military installations.

12. Because of the Air Force's differential treatment of appellants compared to other nonmilitary groups, each of these First Amendment and regulatory violations also constitutes a denial of equal protection. *See Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 133–136, 97 S.Ct. 2532, 2541–2543, 53 L.Ed.2d 629 (1977).