**Joan BROWN, et al., Plaintiffs,**

v.

**Colonel James O. PALMER, et al., Defendants.**

**Civ. A. No. 87–M–1131.**

United States District Court, D. Colorado.

July 20, 1988.

**1046**

Newman E. McAllister, Donald E. King, Colorado Springs, Colo., for plaintiffs.

Richard J. Nolan, Sp. Asst. U.S. Atty., Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

The plaintiffs filed a first amended complaint on August 31, 1987, seeking a preliminary injunction enjoining the defendants from preventing or impeding the plaintiffs from attending "Guest Day" at Peterson Air Force Base on September 12, 1987, to hand out leaflets concerning military power and to discuss those issues with the public. This court issued such an injunction on September 4, 1987, and an amended order on September 11, 1987.

The order of preliminary injunction, as amended, prevented interference with the plaintiffs in these activities only while they stayed within a specified area on the base, designated by the base commander, which area was required to be comparable to those occupied by others manning booths and tables for other purposes. The order required the plaintiffs to behave in a peaceful and orderly manner, and to keep the designated area clean. It authorized immediate removal of the plaintiffs for any violation of the terms and conditions specified in the order.

That injunctive order was based on this court's written findings of fact and conclusions of law, entered September 4, 1987 as a result of an evidentiary hearing held on September 2, 1987. All of the plaintiffs had been issued "bar letters" upon their removal from Peterson Air Force Base (Peterson AFB) on earlier occasions when the public was invited to attend Armed Forces Day celebrations with an "open house" comparable to the September 12, 1987 guest day. Those bar letters were issued as a result of their earlier efforts to distribute leaflets and discuss their viewpoint with the public. The bar letters permanently forbade the plaintiffs from re-entry to the base and threatened them with prosecution pursuant to 18 U.S.C. § 1382.

The plaintiffs seek to have those bar letters declared null and void as violative of the rights protected by the First Amendment to the United States Constitution. That claim is now before this court

on cross motions for summary judgment pursuant to a stipulation of agreed facts, filed April 29, 1988, which include the following pertinent paragraphs:

3. It is customary for the military installations in the Colorado Springs, Colorado area to have annual Armed Forces Day celebrations. Such Celebrations were held on May 13, 1985 and May 17, 1986 at Peterson Air Force Base. The May, 1987 celebration was postponed to and held on September 12, 1987 at Peterson Air Force Base to coincide with the 40th birthday celebration of the U.S. Air Force. . . . These celebrations are authorized by and held pursuant to Air Force Regulation 190–1. . . .

Such celebrations are widely publicized and promoted in the local media as available to and free for the local public to attend. At such celebrations the public roadway gates to Peterson Air Force Base are open to members of the public subject to compliance with the Peterson Air Force Base commander's orders.

4. A schedule of activities for the celebration on September 12, 1987 [attached to the stipulation, indicates that the activities included air shows and demonstrations, a military working dog demonstration and a concert]. In addition to those events the following activities took place at the Base on that day pursuant to these Defendants' permission:

a. Military contractors for the Air Force had exhibits staffed by civilian personnel which explained the operation and function of current weapons systems and equipment used by the Air Force. Literature was available to the public . . .

b. Recruiting activities to attract enlistees into the Air Force of Air Force Reserve including printed information which was available to the public.

c. Recruiting activities to encourage persons to seek appointment as cadets to the Air Force Academy including printed information which was available to the public.

d. Recruiting activities to attract candidates for the Reserve Officers Training Corps including printed information which was available to the public.

e. Printed circulars advertising the Cheyenne, Wyoming Year Round Walk for 1987 and advertising the Historic Macgregor Ranch Walk on September 19 and 20, 1987, both of which circulars were available to the public. . . .

f. A newspaper entitled the Space Observer dated Saturday September 12, 1987 which was available to the public. . . .

g. An invitation to join the International Plastic Molders Society which was available to the public. . . .

5. There is no schedule of events available for the events of May 13, 1985 and May 17, 1986. But the activities on those days and the literature available to the public would be very similar to the literature and activities detailed in paragraph 4 of this stipulation.

6. Plaintiffs Peter Sprunger–Froese, Susan Matarrese and Joan Brown attended the May 13, 1985, Armed Forces Day celebration at Peterson Air Force Base. At that time they leafletted and talked with other persons attending the celebration about information similar to the general content of exhibits K and L. [Those exhibits are attached to this court's opinion as Appendices 1 and 2]. Shortly after beginning such activities, these three plaintiffs were given a choice to desist the activity or leave the base. Upon their refusal, they were escorted off the Base by the Air Force Security Police. They were then given "bar letters" pursuant to 18 U.S.C. 1382. . . .

7. All Plaintiffs attended the May 17, 1986, Armed Forces Day celebration at Peterson Air Force Base. At that time they attempted to leaflet and talk with other persons attending the celebration. . . . . Plaintiffs Johnson, Sheetz and Parker were given the choice to desist the activity or leave the base. Upon their failure to do so they were detained by the Air Force Security Police acting under the control of these Defendants or

their predecessors, escorted off the base and issued "bar letters" pursuant to 18 U.S.C. 1382.... Plaintiffs Sprunger–Froese, Mararrese and Brown were arrested, taken to base headquarters and cited into federal court for a violation of 18 U.S.C. 1382. Plaintiffs Johnson, Sheetz and Parker attempted to reenter the base shortly thereafter for the purpose of continuing their leafletting and explanations. They were immediately arrested, taken to base headquarters and cited in federal court with a violation of 18 U.S.C. 1382. All Plaintiffs pleaded not guilty to the charges as set forth in federal court. Those charges were dismissed on or about October 3, 1986, upon the motion of the United States Attorney.

8. Prior to filing this action, the Plaintiffs requested cancellation of the previously issued bar letters. When Defendants denied the request and so advised the Plaintiffs in writing, no further administrative remedy was available to Plaintiffs.

Peterson AFB is a closed base and normally civilians are not allowed to enter without authorization. Colonel James O. Palmer, Commander of Peterson AFB, explained that the "open house" days are designed to foster good relations with the surrounding civilian community. Air Force personnel display and demonstrate equipment and displays by defense contractors are permitted. According to Col. Palmer, "As a matter of long standing policy, the Department of the Air Force does not engage in any activities which might be interpreted as associating the Department with particular ideological or political causes, parties or candidates.... At Peterson, we have a consistent policy of not allowing the organized dissemination of material advocating political or ideological positions, or allowing solicitation of people to advocate causes. Requests have come in from various groups asking permission to circulate petitions for causes, or solicit support for causes but these have been denied." Affidavit of Palmer, submitted during the September 2, 1987 evidentiary hearing.

United States Air Force Chief of Staff, General Larry D. Welch, made the following declaration pursuant to 28 U.S.C. § 1746 on February 2, 1988:

3. "Open House" celebrations are an integral part of the overall Air Force mission, and help provide the vital link of public awareness that is so important to the federal military forces in a democracy;

4. That "Open House" celebrations are oriented toward base-community relations, and that funds expended for this purpose are specifically authorized and tightly budgeted to ensure that the public is well-informed concerning the military forces their tax dollars help to support;

5. That historically, the activities at an "Open House" celebration have centered around static displays of current and historic Air Force aircraft, displays and information concerning weapons carried on the aircraft, and "air shows" by various aerial demonstration units, such as the Thunderbirds;

6. That traditionally, these "Open House" events have invited the public to come to the base, observe the various displays and events, and ask questions of the hosting military unit about their role in the defense of our country;

7. That because of their military missions, even during an "Open House," military authorities are required to exercise a degree of control over their bases that has no counterpart in the public arena. This requirement is necessitated due to the fact that units must be responsive to the national command authority and other appropriate commanders at any moment, a requirement that remains uninterrupted throughout the "Open House" event;

8. That an "Open House" event was never intended to function as an open political forum for the discussion and debate of the important and sometimes divisive political questions of the day, whether related to the role of the military forces in the defense of the country or not;

9. That based on the traditionally neutral and apolitical stance of the armed forces, the Air Force has uniformly resisted any ideological entanglement with the presentation of political ideas or positions on a military installation, whether pro- or anti-military, or otherwise, in an effort to avoid any appearance of favoring one faction over another;

10. That the concept of an "Open House" is essentially one of "come look and see," where the military's historically neutral political position would not be challenged or impugned, nor one where the event would be turned from its designed purpose into a "free for all," pitting opposing political factions against one another;

11. That if the Air Force were required to provide equivalent accommodation to any political group desirous of projecting its views upon those taking part in the "Open House" celebration, the additional security requirement and politicization of the "Open House" would probably cause a fundamental reevaluation of the rationale for holding an "Open House" at all.

In *United States v. Albertini,* 472 U.S. 675, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985), the Supreme Court held that the respondent could be convicted for violating 18 U.S.C. § 1382 for reentering Hickam Air Force Base after having received a bar letter from the commanding officer in 1972 for obtaining secret Air Force documents and destroying them with animal blood. The Court rejected the argument that his entry on the base in May of 1981, to attend the base's annual open house for Armed Services Day, was protected by the First Amendment. The Court limited the holding in *Flower v. United States,* 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972), to preclude prohibition of speech under circumstances in which a "portion of a military base constitutes a public forum because the military has abandoned any right to exclude civilian traffic and any claim of special interest in regulating expression ..." *United States v. Albertini,* 472 U.S.

at 685–86, 105 S.Ct. at 2904–05 (citations omitted).

In *Albertini* the Court never resolved whether the base had become an open forum. "Military bases are generally not public fora, and *Greer* expressly rejected the suggestion that 'whenever members of the public are permitted freely to visit a place owned or operated by the Government, then that place becomes a public forum for purposes of the First Amendment.'" *United States v. Albertini,* 472 U.S. at 686, 105 S.Ct. at 2905 (citing *Greer v. Spock,* 424 U.S. 828, 836, 96 S.Ct. 1211, 1216–17, 47 L.Ed.2d 505 (1976)). The Court noted that the district court did not make any express findings on the nature of public access to the base "and the record does not suggest that the military so completely abandoned control that the base became indistinguishable from a public street as in *Flower.*" *United States v. Albertini,* 472 U.S. at 686, 105 S.Ct. at 2905. Irrespective of the nature of the forum, the *Albertini* Court concluded that:

> The fact that respondent had previously received a valid bar letter distinguished him from the general public and provided reasonable grounds for excluding him from the base. That justification did not become less weighty when other persons were allowed to enter. Indeed, given the large number of people present during an open house, the need to preserve security by excluding those who have previously received bar letters could become even more important, because the military may be unable to monitor closely who comes and goes. Where a bar letter is issued on valid grounds, a person may not claim immunity from its prohibition on entry merely because the military has temporarily opened a military facility to the public.

*Id.* at 687, 105 S.Ct. at 2096.

The defendants argue that *Albertini* is applicable even though the plaintiffs' bar letters were not issued because of criminal activity. They assert that under *Greer v. Spock,* 424 U.S. 828, 836, 96 S.Ct. 1211, 1216–17, 47 L.Ed.2d 505 (1976), Peterson AFB did not become a public forum simply

because "members of the public are permitted to freely visit" it. The defendants argue that the plaintiffs' activities are inconsistent with the purpose of the open house to "show the mission, equipment, facilities, people, skills and professionalism required to operate the Air Force." Defendants' brief at p. 9.

The defendants also rely on *Persons for Free Speech at SAC v. United States Air Force,* 675 F.2d 1010 (8th Cir.), *cert. denied,* 459 U.S. 1092, 103 S.Ct. 579, 74 L.Ed. 2d 939 (1981), where a divided Eighth Circuit Court of Appeals held that an open house is within the range of traditional military activities and thus no public forum is created. The court concluded that while the military may be involved in "speech", it was not "ideological" because it is attributable to our civilian government. The dissenting judges concluded that the Air Force could not invite the public to an open house and permit only one side of the national security debate to be heard.

Air Force Regulation 190–1, Chapter 1, Section B—Public Affairs Program Objectives, paragraph 1–2, states that:

> The Air Force Public Affairs Program was established to increase the public's understanding and knowledge of the Air Force mission and needs. Recognition of public interests and attitudes is essential, because the role of aerospace power in our national defense eventually must be resolved by the citizens of the United States. Also, this public understanding cannot be achieved without a similar understanding within the Air Force. Each person in the Air Force, both military and civilian, therefore, must be familiar with the Air Force mission and roles and become a reliable source of information.

Stipulated Facts, Exhibit A–1. Paragraph 1–3 of Chapter 1, Section B states the primary objectives of the public affairs program:

> a. To assist the American people, including Air Force members, in their understanding of:
>
> (1) Threats to the United States and the Free World, and the need for the Air Force to be alert against potential aggression.
>
> (2) The relationship of the Air Force to the other United States Armed Services.
>
> (3) The day-to-day activities of the Air Force and its capability as an instrument of national policy.
>
> (4) The need for continual research, development and modernization of Air Force systems.
>
> (5) The need to attract and retain qualified Air Force personnel.
>
> (6) The essential role of the United States aerospace power in international relations.

Stipulated Facts, Exhibit A–1.

Chapter 4 of Regulation 190–1 at paragraph 4–1 a, further states that "In a democratic nation the citizens have a right to know how efficiently and to what purpose the armed forces are using their personnel and monies to achieve national security." Stipulated Facts, Exhibit A–3. Armed Services Days are designed "to demonstrate the unity and common purpose of the Armed Forces to fulfillment of our national security requirements." Regulation 190–1, Chapter 4, Section K, paragraph 4–59.

The Supreme Court in *Perry Local Educators Association v. Perry Education Association,* 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983), stated that the standards by which limitations on speech must be evaluated "differ depending on the character of the property at issue." The Court identified three types of fora: the traditional public forum, such as streets and parks; the public forum created by government designation, such as university meeting facilities and municipal theatres; and, the non-public forum. The Court said of a public forum created by government designation, "Although a State is not required to indefinitely retain the open character of a facility, as long as it does so, it is bound by the same standards as apply in a traditional public forum. Reasonable time, place, and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compel-

ling state interest." *Id.* at 46, 103 S.Ct. at 955.

Peterson AFB has been a public forum on open house days. The materials made available to the public on those days include more speech than that which can properly be characterized as the performance of the traditional military mission. The Air Force engages in recruiting, defense contractors are permitted to discuss the weapons systems they manufacture, circulars advertising walks are disseminated, and a molders society can solicit members. Stipulation, ¶¶ 4 a, e, g. One of the plaintiffs attending the quest day on September 12, 1987, obtained a single sheet invitation from the Peterson AFB Chapel to attend a luncheon and lecture on September 26, 1987 entitled "Living Life with the Living God," a book entitled "About Being Catholic," a newspaper entitled "The Catholic Herald," and The Good News New Testament Bible, with the frontispiece enscribed "Presented by the Air Force." On open house days Peterson AFB base is not significantly different from the football stadium or the chapel at the United States Air Force Academy. *See, United States v. Gourley,* 502 F.2d 785 (10th Cir.1973).

Once the base becomes a public forum on open house days, the authority of the base commander "to limit expressive activity [is] sharply circumscribed." *Perry,* 460 U.S. at 45, 103 S.Ct. at 954. Any limitations on speech must be content neutral. The plaintiffs cannot be barred from the base because they wish to present views about national security that are antithetical to those expressed by the Air Force and defense contractors. The Air Force and, more particularly, the base commander "may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities." *Police Department of Chicago v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1971). Based on the stipulated facts, and the affidavit accompanying the plaintiffs' motion for summary judgment, it is clear that the base commander

has arbitrarily singled out the plaintiffs, barring them from re-entry on the base, because of the content of their message. Such action is violative of the First Amendment.

The recent Supreme Court decision of *Frisby v. Schultz,* —— U.S. ——, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), cited by the defendants in their reply brief, does not require this court to find for the defendants. There, the Supreme Court held that an ordinance making it unlawful to engage in picketing before or about the residence of a person was not facially invalid under the First Amendment. The Court considered the significance of the asserted governmental interest and the availability of alternative channels of communication, only *after* it concluded that the ordinance was content neutral. The decision to issue bar letters to the plaintiffs was not based upon content neutral criteria, but rather upon the belief that the content of the plaintiffs' speech was inconsistent with the stated purposes of open house celebrations.

This court rejects the reasoning of the majority in *Persons for Free Speech at SAC v. United States Air Force,* 675 F.2d at 1022. When the base commander can decide which groups or messages are consistent with the purpose of the open house, and include among those permitted to "speak" community service organizations and a city chamber of commerce, then he engages in the kind of content-based discrimination which is intolerable under the First Amendment. The statements of the purposes of the open house celebrations in Air Force Regulation 190–1 and by the Air Force Chief of Staff euphemistically express a patently political appeal for continued public support for an existing governmental policy of national defense. To say, as the Eighth Circuit did, that such speech by military officers is not ideological or political because the military is under civilian control is to deny the fundamental principle of republican government—the authority of the people to change governmental policy through the elective process after free and robust debate.

Additionally, as demonstrated by the plaintiffs' compliance with the conditions of the preliminary injunction that the court issued in this case, these activities can be permitted without interference with the other open house activities. Indeed, Lewis C. Pulley, a Captain in the United States Air Force, assigned as an assistant staff judge advocate, observed the plaintiffs on the September 12, 1987 Armed Forces Day, and stated that "They handed out leaflets in basic compliance with the judge's orders as far as I could see." Affidavit p. 1. The conditions contained in the preliminary injunction, and complied with by the plaintiffs, are reasonable time, place and manner restrictions, that the defendants may utilize in the future to maintain a peaceful and orderly environment. *See, Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1980). In sum, the plaintiffs' activities have been compatible with the open house celebrations held at Peterson AFB.

This court's holding is limited to the finding that the bar letters issued to the plaintiffs during the open house celebrations in 1985 and 1986 are invalid. On those days, Peterson AFB became a public forum, and the plaintiffs had the right to express their views, subject to reasonable time, place and manner restrictions. This court does not and cannot decide whether all open house celebrations necessarily transform Peterson AFB into a public forum.

■ The plaintiffs have requested reasonable attorney's fees and costs pursuant to 28 U.S.C. § 2412. It is this court's view that the position of the defendants was substantially justified and, therefore, the plaintiffs are not entitled to attorney's fees. 28 U.S.C. § 2412(d)(1)(A).

Upon the foregoing, it is

ORDERED that the bar letters issued to the plaintiffs on the open house days held in 1985 and 1986 are invalid, and it is

FURTHER ORDERED that the plaintiffs' request for attorney's fees is denied.

APPENDIX I

# HEY KIDS!

It might be fun to play war and pretend to shoot a machine gun or fly a bomber... but it's important to remember that war is not a game.

It's not fun to be killed or to watch as your mom, dad, brothers and sisters die. That's what happens during a war.

When those big shiny planes drop bombs in the movies, it's exciting... but in *real life* there are *real people* where those bombs fall and they are ripped apart by the explosion.

During World War II our country made and dropped a bomb on Japan that killed 70,000 people. Now, 40 years later, people are still sick and dying because of that one bomb.

We need to study ways of solving problems *without* killing people and destroying their homes. It's not easy, but it's possible.

FOR MORE INFORMATION: 411 W. BIJOU, CO SPRINGS, CO 80905

APPENDIX II

# ARMED FORCES DAY

**WHO SAYS, "WAR IS HELL"?**

In Colorado Springs it's a carnival! This year it's as true as ever: "Displays of military equipment, demonstrations and entertainment..." provide a war-is-fun promotional package. "Hey kids, pony rides and tank rides--take your pick , they're all the same!" Balloons and parachutes, cotton candy, hot dogs and soda pop, bandstands, flags, clergy and lots of music, music, music: all to teach the excitment of war and war-making. Each year the local newspapers measure the success of Armed Forces Day by printing pictures of small boys wearing big grins and lopsided helmets, and shooting imaginary enemies with oversized machine guns.

How we teach children about war is more important than what we teach them. War taught in the context of Armed Forces Day a la Colorado says much more to children about the fun of war than does Dad saying, "War is hell" a thousand times.

That adults engage in Armed Forces Day celebration is one thing, but to teach it to children borders on the tragic. Obviously, Armed Forces Day programs are not geared to detail the hellish nature of war but rather to provide an opportunity for Pentagon public relations people to exploit the wonder and fascination of children for their death-dealing occupations. Recruiters are omnipresent to assure that the wonder and fascination will not be wasted.

The them "sex education" generates a whole complex of parental feeling and concern. Unfortunately, "war education" brings up no such feelings. It is a paradox of deep. and complicated mystery. Parents become distraught over the possibility that two of their children could indiscriminately produce another human being through misguided sex, but manifest no such emotional surges over the fact that one of their children could indiscriminately kill millions.

If children must attend these "field trips," at least minimal parental preparation is in order to dull the noise of the Pentagon circus tent. Perhaps viewing some films documenting Hiroshima and Nagasaki, Dresden or Tokyo; perhaps feeling burning napalm close to one's flesh; perhaps a tour of one of the military's many rehab-hospitals talking with the limbless, mindless victims; perhaps an explanation that the weapons with which the children play have the power to destroy play forever.

Even novice backyard gardeners know that they reap what they sow. Planting seeds of adventuresome and titillating war in the fertile minds of youth will reap a sure harvest, but not the harvest of peace that we so desire. The seeds will bring forth what their destiny requires: more war, more death. There is a way to teach war so that it is repugnant to the human spirit. It would not take much imagination to develop. The old way of teaching war we know only too well. When will we ever learn? Will you help us find another way?

For more information: 411 West Bijou Street, Colorado Springs, Colorado 80905  303-635-5078