915 F.2d 1435
 Joan BROWN; Donna R. Johnson; Susan Matarrese; Geoffrey
Parker; Mary Lynn Sheetz; Peter Sprunger-Froese,
Plaintiffs-Appellees,
v.
Colonel James O. PALMER, Base Commander of Peterson Air
Force Base, Colorado, and Colonel Eugene T.M. Cullinane,
Commander, Headquarters, 3rd Space Support Wing (Afspacecom)
Peterson Air Force Base, Colorado, as officers and agents of
the United States Air Force, an agency of the United States
of America, Defendants-Appellants.
 No. 88-2450.
 United States Court of Appeals,
Tenth Circuit.
 Oct. 3, 1990.
Order on Rehearing and Rehearing
Granted Nov. 6, 1990.
 
 Patricia M. Bryan (John R. Bolton, Asst. Atty. Gen., Washington, D.C., Michael J. Norton, U.S. Atty., Denver, Colo., and Anthony J. Steinmeyer and Robert K. Rasmussen, Attys., Appellate Staff, Civil Div., U.S. Dept. of Justice, Washington, D.C., on the briefs), for defendants-appellants.
 Newman E. McAllister, (Donald E. King with him on the brief), Colorado Springs, Colo., for plaintiffs-appellees.
 Hilary Holland, Westminster, Colo., and David Miller, Denver, Colo., filed a brief for amicus curiae American Civil Liberties Union of Colo.
 Before MOORE, BRORBY, and EBEL, Circuit Judges.
 EBEL, Circuit Judge.
 
 
 1
 This is an appeal from the district court's July 20, 1988 judgment declaring that certain bar letters were issued to plaintiffs in violation of their First Amendment rights. 689 F.Supp. 1045. The bar letters were issued after plaintiffs refused to cease distributing leaflets at Peterson Air Force Base ("Peterson AFB") in Colorado Springs, Colorado, during open houses held in 1985 and 1986 to celebrate Armed Forces Day. Because Peterson AFB was not a public forum at the time that plaintiffs were distributing their leaflets, and because the restrictions on plaintiffs' speech were reasonable and viewpoint neutral, we reverse.
 
 FACTS
 
 2
 On May 13, 1985, three of the plaintiffs, Joan Brown, Susan Matarrese, and Peter Sprunger-Froese, distributed leaflets containing a pacifist message during an open house held at Peterson AFB to celebrate Armed Forces Day. After refusing a request by military authorities to either stop distributing the leaflets or leave the base, they were escorted off the base and were issued bar letters pursuant to 18 U.S.C. Sec. 1382,[1] prohibiting them from entering the base without the prior written permission of the base commander.
 
 
 3
 During the May 17, 1986 Armed Forces Day celebration at Peterson AFB, all six plaintiffs began distributing leaflets portraying the horrors of war. Brown, Matarrese, and Sprunger-Froese were arrested for violating the terms of the bar letters that had been issued against them. After refusing a request to either cease leafletting or leave the base, the remaining three plaintiffs, Donna R. Johnson, Geoffrey Parker, and Mary Lynn Sheetz, were escorted off the base and were issued bar letters. Johnson, Parker, and Sheetz then attempted to reenter the base without prior written permission and were arrested. The charges against all of the plaintiffs were subsequently dropped.
 
 
 4
 On July 27, 1987, plaintiffs initiated this action against Colonel James O. Palmer, the Base Commander of Peterson AFB, and Colonel Eugene T.M. Cullinane, the commanding officer of the headquarters of the Air Force's 3rd Space Support Wing, in their official capacities. Plaintiffs sought a preliminary injunction to permit them to attend an open house celebration at Peterson AFB planned for September 12, 1987. Plaintiffs also sought a declaration that the bar letters were issued in violation of their First Amendment rights. On September 4, 1987, the district court issued a preliminary injunction in accordance with plaintiffs' request. This court denied a request by the United States for emergency relief from the injunction.
 
 
 5
 On July 20, 1988, the district court granted plaintiffs' request for declaratory relief. The court concluded that Peterson AFB had become a "public forum" during the 1985 and 1986 Armed Forces Day celebrations. The court based its conclusion on the parties' stipulation that the activities occurring at the 1985 and 1986 Armed Forces Day open houses were similar to the following activities that took place at the 1987 open house: (1) Air Force recruiting; (2) discussions by defense contractors concerning their weapons systems currently in use by the Air Force; (3) distribution of circulars advertising the Cheyenne, Wyoming Year Round Walk for 1987 and advertising the Historic Macgregor Ranch Walk in Estes Park, Colorado; (4) distribution of a newspaper entitled the Space Observer; and (5) solicitation of the public to join the International Plastic Molders Society. In addition, one of the plaintiffs attending the 1987 Guest Day received the following: (1) an invitation from the Peterson Air Force Base Chapel to attend a luncheon and religious lecture; (2) a book entitled "About Being Catholic"; (3) a newspaper entitled "The Catholic Herald"; and (4) a copy of The Good News Testament Bible that contained the inscription "Presented by the Air Force." In light of those facts, the court concluded that during the 1985 and 1986 Armed Forces Day celebrations, Peterson AFB was a public forum.
 
 
 6
 Defendants contend that the bar letters were issued because of the ideological content of plaintiffs' speech. The Air Force does not permit anyone to enter the base to convey political or ideological messages. See R. Vol. I, Doc. 9, Tab 1, at 2 (Aff. of Colonel James O. Palmer); R. Vol. II at 1-15 (testimony of Colonel James O. Palmer). As a result, the district court concluded that the Air Force violated plaintiffs' First Amendment rights because it engaged in content-based regulation, which is not permitted in a public forum absent a compelling state interest.
 
 
 7
 On September 16, 1988, the United States Attorney for the District of Colorado filed a notice of appeal. The caption of the notice of appeal read as follows:
 
 
 8
 JOAN BROWN, et al.,
 
 
 9
 Plaintiff-appellees,
 
 
 10
 v.
 
 
 11
 COLONEL JAMES O. PALMER, et al.,
 
 
 12
 Defendant-appellants.
 
 
 13
 The notice of appeal did not indicate whether Colonel Palmer was filing the appeal in his official capacity as Commander of Peterson AFB. The notice of appeal also did not specifically list Colonel Eugene T.M. Cullinane, the other defendant named in plaintiffs' complaint, as a party to the appeal. On October 5, 1988, this court ordered the parties to submit memorandum briefs addressing whether we had jurisdiction over the appeal in light of Torres v. Oakland Scavenger Co., 487 U.S. 312, 108 S.Ct. 2405, 101 L.Ed.2d 285 (1988). In Torres, the Supreme Court held that the failure to file a notice of appeal in accordance with Fed.R.App.P. 3(c)[2] presents a jurisdictional bar to the appeal.
 
 DISCUSSION
 
 14
 I. The Notice of Appeal Was Sufficiently Specific
 
 
 15
 In this case, the United States satisfied the jurisdictional requirement of Rule 3(c) by specifically designating Colonel Palmer in its notice of appeal because plaintiffs and this court had the requisite "fair notice of the specific individual or entity seeking to appeal." Torres, 487 U.S. at 318, 108 S.Ct. at 2409. Plaintiffs clearly understood that an appeal by Colonel Palmer was in effect an appeal by the United States in light of the fact that they had sued Colonel Palmer and Colonel Cullinane only in their official capacities. See Kentucky v. Graham, 473 U.S. 159, 165-66, 105 S.Ct. 3099, 3104-05, 87 L.Ed.2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). Moreover, the United States Attorney for the District of Colorado filed the notice of appeal as counsel for the defendants.[3]
 
 
 16
 Plaintiffs argue that because the notice of appeal did not state that Colonel Palmer was appealing in his official capacity, the time period allowed for private parties to file their appeals must apply,[4] and therefore, the appeal is untimely. We disagree. Here, the United States clearly desired to appeal, and its failure to designate that Colonel Palmer was appealing in his official capacity did not deprive the parties or this court of fair notice that the United States was the true appellant. See King v. Otasco, Inc., 861 F.2d 438, 443 (5th Cir.1988) (failure to designate the capacities in which a party appeals does not render notice of appeal ineffective). In light of the fact that the notice of appeal was filed within the sixty-day period permitted under Fed.R.App.P. 4(a)(1), we have jurisdiction to decide this appeal.
 
 
 17
 II. Peterson Air Force Base Was Not A Public Forum
 
 
 18
 The degree to which the government can regulate communicative activity on its property depends upon the type of property involved. The Supreme Court has grouped government property into three categories for First Amendment purposes: (1) traditional public fora; (2) public fora created by government designation; and (3) nonpublic fora. See United States v. Kokinda, --- U.S. ----, 110 S.Ct. 3115, 3119-20, 111 L.Ed.2d 571 (1990); Perry Education Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45-46, 103 S.Ct. 948, 954-56, 74 L.Ed.2d 794 (1983).
 
 
 19
 Traditional public fora, such as public streets or parks, are places that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939). Designated public fora are places not traditionally available for public assembly and debate but which the government has intentionally opened for expressive activity. See, e.g., Widmar v. Vincent, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (state university meeting facilities expressly made available for use by students); City of Madison Joint School District v. Wisconsin Employment Relations Comm'n, 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976) (school board meetings opened to the public by state statute); Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (municipal auditorium and city-leased theater designed for and dedicated to expressive activities). Nonpublic fora are places that have not been opened for expressive activity by either tradition or designation. See, e.g., Perry, 460 U.S. 37, 103 S.Ct. 948, (school district's internal mail system); Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (military base); Adderley v. Florida, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) (prison).
 
 
 20
 In a public forum, created either by tradition or designation, the government may impose restrictions on the time, place, or manner of speech that is protected by the First Amendment "provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant government interest, and that they leave open ample alternative channels for communication of the information.' " Ward v. Rock Against Racism, --- U.S. ----, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989) (quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)). However, the government may not regulate on the basis of content unless it is "necessary to serve a compelling state interest" and the regulation is "narrowly drawn to achieve that end." Perry, 460 U.S. at 45, 103 S.Ct. at 955.
 
 
 21
 In a nonpublic forum, the government may enforce the same type of reasonable time, place, and manner regulations that are permitted in a public forum. In addition, the government may regulate on the basis of the content of speech, as long as its regulations are reasonable and viewpoint neutral. Id. at 46, 103 S.Ct. at 955.
 
 
 22
 The government concedes that its restrictions on plaintiffs' speech are content-based. Appellant's Br. at 21; Appellant's Reply Br. at 8. Therefore, a great deal turns on whether Peterson AFB was a public forum during the 1985 and 1986 Armed Forces Day celebrations. If Peterson AFB was a public forum, the government would have to demonstrate a compelling interest to justify the restrictions. However, if Peterson AFB was a nonpublic forum, the government would have to prove only that its restrictions were reasonable and not the product of viewpoint discrimination.
 
 
 23
 Whether Peterson AFB was a public forum is a mixed issue of fact and law. We review the underlying factual findings under a "clearly erroneous" standard, but we review de novo the legal conclusion of whether those facts make Peterson AFB a public forum. Here, there is no significant dispute about the underlying facts, and the only real controversy relates to the legal significance of those facts. Accordingly, we apply a de novo standard to review the conclusion that Peterson AFB was a public forum. See Love Box Co. v. C.I.R., 842 F.2d 1213, 1215 (10th Cir.1988), cert. denied, 488 U.S. 820, 109 S.Ct. 62, 102 L.Ed.2d 40 (1988); Mullan v. Quickie Aircraft Corp., 797 F.2d 845, 850 (10th Cir.1986). But cf. Jarman v. Williams, 753 F.2d 76, 79 (8th Cir.1985) (utilizing, without discussion, a clearly erroneous standard to affirm a finding that a school was not a public forum).
 
 
 24
 In addition, because the public forum issue is so central to determining whether speech on the base can constitutionally be regulated, an independent review of the record by the appellate court is warranted. In Trenouth v. United States, 764 F.2d 1305 (9th Cir.1985), the Ninth Circuit applied a de novo standard when it reviewed whether a military installation was a public forum, explaining that the public forum "issue[ ] present[§ a] mixed question[ ] of law and fact implicating constitutional rights and, therefore, ... [is] reviewable de novo." Id. at 1307. "[I]n cases raising First Amendment issues [the Supreme Court has] repeatedly held that an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure 'that the judgment does not constitute a forbidden intrusion on the field of free expression.' " Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984) (quoting New York Times Co. v. Sullivan, 376 U.S. 254, 284-86, 84 S.Ct. 710, 728-29, 11 L.Ed.2d 686 (1964)). See Houston v. Hill, 482 U.S. 451, 458 n. 6, 107 S.Ct. 2502, 2507 n. 6, 96 L.Ed.2d 398 (1987); NAACP v. Claiborne Hardware Co., 458 U.S. 886, 915-16 n. 50, 102 S.Ct. 3409, 3426-27 n. 50, 73 L.Ed.2d 1215 (1982).
 
 
 25
 The Supreme Court has repeatedly indicated that a military base can be transformed into a public forum only in extreme circumstances. "[I]t is ... the business of a military installation ... to train soldiers, not to provide a public forum." Greer, 424 U.S. at 838, 96 S.Ct. at 1217. "A military base ... is ordinarily not a public forum for First Amendment purposes even if it is open to the public." United States v. Albertini, 472 U.S. 675, 684, 105 S.Ct. 2897, 2904, 86 L.Ed.2d 536 (1985) (quoting lower court). "[T]he Court is particularly reluctant to hold that the government intended to designate a public forum [in cases of].... military reservations and jailhouse grounds...." Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 804, 105 S.Ct. 3439, 3450, 87 L.Ed.2d 567 (1985) (citations omitted).[5]
 
 
 26
 The only time that the Court has found those extreme circumstances to exist was in Flower v. United States, 407 U.S. 197, 92 S.Ct. 1842, 32 L.Ed.2d 653 (1972) (per curiam). In Flower, a civilian was convicted under 18 U.S.C. Sec. 1382 for entering Fort Sam Houston after he had been issued a bar letter. At the time of his arrest, the civilian was peacefully distributing leaflets on New Braunfels Avenue at a point within the boundaries of Fort Sam Houston. Id. at 197, 92 S.Ct. at 1842. No guard was posted anywhere along the avenue, and very substantial and unrestricted civilian traffic flowed along the avenue 24 hours a day. Id. at 198, 92 S.Ct. at 1843. The Court overturned the conviction, holding that New Braunfels Avenue was no different from any public thoroughfare and that the military had "abandoned any claim that it has special interests in who walks, talks, or distributes leaflets on the avenue." Id. (emphasis added).
 
 
 27
 In two subsequent decisions, the Supreme Court declined to extend Flower beyond its "unusual facts." See Albertini, 472 U.S. at 685, 105 S.Ct. at 2904, and Greer, 424 U.S. at 836, 96 S.Ct. at 1216. In Greer, certain political candidates brought suit to enjoin the enforcement of regulations in effect at Fort Dix which banned political speeches and demonstrations and prohibited the distribution of literature without prior written approval. The Supreme Court, in reversing the Third Circuit and upholding the regulations against the candidates' First Amendment challenge, distinguished Flower:
 
 
 28
 The Court of Appeals was mistaken, therefore, in thinking that the Flower case is to be understood as announcing a new principle of constitutional law, and mistaken specifically in thinking that Flower stands for the principle that whenever members of the public are permitted freely to visit a place owned or operated by the Government, then that place becomes a 'public forum' for purposes of the First Amendment. Such a principle of constitutional law has never existed, and does not exist now.
 
 
 29
 Greer, 424 U.S. at 836, 96 S.Ct. at 1216.
 
 
 30
 The Court in Greer went on to note that the authorities at Fort Dix had not abandoned any claim of special interest in regulating the activities of political candidates on the base. As a result, the Court concluded:
 
 
 31
 [T]he Flower decision looks in precisely the opposite direction. For if the Flower case was decided the way it was because the military authorities had 'abandoned any claim [of] special interests in who walks, talks, or distributes leaflets on the avenue,' then the implication surely is that a different result must obtain on a military reservation where the authorities have not abandoned such a claim. And if that is not the conclusion clearly to be drawn from Flower, it most assuredly is the conclusion to be drawn from almost 200 years of American constitutional history.
 
 
 32
 Greer, 424 U.S. at 837, 96 S.Ct. at 1217 (emphasis in original).
 
 
 33
 In Albertini, a peace activist who had been issued a bar letter nine years earlier for destroying secret Air Force documents at Hickam Air Force Base was convicted of violating 18 U.S.C. Sec. 1382 when he reentered the base to attend an open house celebration. Prior to his arrest, the activist was engaged in a peaceful demonstration protesting the nuclear arms race. Albertini, 472 U.S. at 678, 105 S.Ct. at 2901.
 
 
 34
 In upholding the activist's conviction, the Supreme Court characterized as "dubious" the Ninth Circuit's conclusion that Hickam was a temporary public forum during the open house. Id. at 686, 105 S.Ct. at 2905. The Court reaffirmed its narrow reading of Flower and emphasized that a military base does not become a public forum "merely because the base [is] used to communicate ideas or information during [an] open house." Id. at 686, 105 S.Ct. at 2905. The Court further noted that although the district court did not make any explicit findings concerning the degree to which Hickam Air Force Base was accessible to the public during the open house, the record did not indicate "that the military so completely abandoned control that the base became indistinguishable from a public street as in Flower."[6] Id.
 
 
 35
 Thus, the Supreme Court's analysis of First Amendment issues arising on military bases indicates that Peterson AFB was not a public forum. That conclusion is further supported by the Court's analysis in its recent public-forum cases.
 
 
 36
 In those latter cases, the Court emphasized that "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449 (emphasis added). The record demonstrates that the government did not intend to turn Peterson AFB into a public forum. For example, General Larry D. Welch, the Air Force Chief of Staff, stated that "an 'Open House' event was never intended to function as an open political forum for the discussion and debate of the important and sometimes divisive political questions of the day, whether related to the role of military forces in the defense of the country or not." R. Vol. I, Doc. 9, Tab 3, p 8 (Declaration of General Larry D. Welch). In addition, Colonel Palmer stated that in holding the open houses, the Air Force "did not create a forum for debating political or ideological topics." R. Vol. I, Doc. 9, Tab 1, at 3 (Aff. of Colonel James O. Palmer).[7]
 
 
 37
 In concluding that Peterson AFB was a public forum, the district court, instead of focusing on whether the government intended to abandon all control over the content of permitted speech at the fora, focused on the fact that several groups did, in fact, distribute literature at the open house celebrations pertaining to the subjects of religion, the Wyoming Year Round Walk, and the International Plastic Molders Society. Brown v. Palmer, 689 F.Supp. 1045, 1051 (D.Colo.1988). However, this emphasis is misplaced. The Supreme Court has repeatedly held that merely because the government permits some individuals or groups to use its property for communicative purposes does not mean that the property is a public forum and therefore open to all individuals or groups. See Kokinda, 110 S.Ct. at 3121 (" 'the government does not create a public forum by ... permitting limited discourse' " (quoting Cornelius, 473 U.S. at 802, 105 S.Ct. at 3449) (emphasis added in Kokinda )); Cornelius, 473 U.S. at 805, 105 S.Ct. at 3450 ("selective access, unsupported by evidence of a purposeful designation for public use, does not create a public forum"); Perry, 460 U.S. at 47, 103 S.Ct. at 956 (granting permission to some groups to communicate with teachers does not mean that the facility has become a public forum or that permission must be granted to other groups who seek to address areas of other subject matter content); Greer, 424 U.S. at 838 n. 10, 96 S.Ct. at 1217 n. 10; see also Barnard v. Chamberlain, 897 F.2d 1059, 1064 (10th Cir.1990).
 
 
 38
 In light of the above analysis, we conclude that Peterson AFB was not a public forum. We base our conclusion on the lack of any evidence suggesting that the government abandoned any claim of special interest in regulating the open house celebrations at Peterson AFB. We also base our conclusion on the record evidence indicating that the military did not intend to open Peterson AFB to plaintiffs and other individuals or groups seeking to convey ideological or political messages.
 
 
 39
 The Eighth Circuit has arrived at the same conclusion in a case involving very similar facts. See Persons for Free Speech at SAC v. United States Air Force, 675 F.2d 1010, 1015-18 (8th Cir.1982) (en banc), cert. denied, 459 U.S. 1092, 103 S.Ct. 579, 74 L.Ed.2d 939 (1982). In Persons for Free Speech, the Commander of Offutt Air Force Base denied a request by the plaintiffs to participate in an open house celebration to express their anti-military views. In its en banc ruling, the Eighth Circuit concluded that Offutt Air Force Base was not a public forum during the open house celebration because the military had not abandoned any interest in regulating base activities during the open house. Id. at 1015-16.
 
 
 40
 In the instant case, the district court relied on United States v. Gourley, 502 F.2d 785 (10th Cir.1973), as Tenth Circuit authority in support of its conclusion that Peterson AFB was a public forum during the 1985 and 1986 open house celebrations. In Gourley, this court invalidated bar letters that were issued against activists protesting in the public area surrounding the Air Force Academy football stadium just before and during a football game and in the area surrounding the Air Force Academy chapel during ordinary visiting hours. This court began by observing that it had very little authority to guide it at that time other than Flower v. United States and two circuit cases that had interpreted Flower broadly (Spock v. David, 469 F.2d 1047 (3d Cir.1972) and Burnett v. Tolson, 474 F.2d 877 (4th Cir.1973)). However, since Gourley was decided we now know that Flower is to be narrowly construed and limited to its "unusual facts." Albertini, 472 U.S. at 685, 105 S.Ct. at 2904. See Greer, 424 U.S. at 836, 96 S.Ct. at 1216. Although the court in Gourley interpreted Flower to suggest that the government cannot restrict an individual's exercise of his First Amendment rights in any areas of an installation "open to the general public," the Supreme Court in Greer "expressly rejected the suggestion that 'whenever members of the public are permitted freely to visit a place owned or operated by the Government, then that place becomes a "public forum" for purposes of the First Amendment.' " Albertini, 472 U.S. at 686, 105 S.Ct. at 2905 (quoting Greer, 424 U.S. at 836, 96 S.Ct. at 1216). We are, of course, bound by the Supreme Court's subsequent interpretation of Flower, and we are now required to give Gourley a correspondingly narrow interpretation. In any event, Gourley involved far greater public access and much less effort by the military to exercise any supervision and control over the content of the public speech at those premises than was the case at Peterson AFB. Thus, the evidence of abandonment of any control over the content of speech in Gourley was far stronger than the evidence in this case.
 
 
 41
 III. The Restrictions Were Reasonable and Viewpoint Neutral
 
 
 42
 Our determination that Peterson AFB was not a public forum does not end our inquiry. Although the government is permitted greater latitude to regulate speech in a nonpublic forum, it must still regulate in a reasonable, viewpoint-neutral manner. For the reasons expressed below, we conclude that the restrictions on plaintiffs' speech were reasonable and viewpoint neutral.
 
 
 43
 Peterson AFB has "a consistent policy of not allowing the organized dissemination of material advocating political or ideological positions, or allowing solicitation of people to advocate causes." R. Vol. I, Doc. 9, Tab 1, at 2 (Aff. of Colonel James O. Palmer). Nothing in the record suggests that any third party espousing pro-war views was permitted to distribute leaflets at Peterson AFB during the open house celebrations.[8] Nevertheless, plaintiffs argue that there was impermissible viewpoint discrimination because the military used the open house "to convince the public that a strong Air Force is vital to the foreign policy of the United States" but did not permit plaintiffs to present their opposing viewpoint "that there is a human price behind the Air Force's activities and that all of the weapons on display [at the open house celebrations] are designed to kill other people." Appellees' Br. at 11.[9]
 
 
 44
 It is questionable whether the Air Force in fact used the Armed Forces Day celebrations to convey an ideological message concerning its proper role in United States foreign policy. The purpose of an open house celebration is to inform the public about the equipment, facilities and personnel needed to successfully operate the Air Force. See R. Vol. I, Doc. 8, Exhibit A-4, p 4-29 (Air Force Regulation 190-1). It appears that "the concept of an 'Open House' is essentially one of 'come look and see,' where the military's historically neutral political position would not be challenged or impugned, nor one where the event would be turned from its designed purpose into a 'free for all,' pitting opposing political factions against one another." R. Vol. I, Doc. 9, Tab 3, p 10 (Declaration of General Larry D. Welch).
 
 
 45
 Even if the Air Force did use the open house celebrations to convey an ideological message, we would be reluctant to base a finding of viewpoint discrimination on the military's failure to permit plaintiffs to express their opposition to any messages allegedly conveyed by the military itself (as opposed to third parties) during the open houses at Peterson AFB. Government speech would be unduly chilled if any individual or group with views contrary to those of the government were entitled to access to non-public governmental fora for rebuttal. If we were to accept plaintiffs' argument, " 'display cases in public hospitals, libraries, office buildings, military compounds, and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician. This the Constitution does not require.' " United States Postal Service v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 130 n. 6, 101 S.Ct. 2676, 2686 n. 6, 69 L.Ed.2d 517 (1981) (quoting Lehman v. City of Shaker Heights, 418 U.S. 298, 304, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974) (plurality opinion)).
 
 
 46
 We next turn to the issue of whether the restrictions were reasonable. The Supreme Court has noted that a restriction "need not be the most reasonable or the only reasonable limitation" in order to satisfy the reasonableness requirement. Kokinda, 110 S.Ct. at 3122 (quoting Cornelius, 473 U.S. at 808, 105 S.Ct. at 3452). With that in mind, we conclude that prohibiting the dissemination of political or ideological messages was a reasonable way to preserve security at Peterson AFB and to maintain the traditional position of neutrality of the military on political and ideological issues.
 
 
 47
 Maintaining security on a military base is no easy task, particularly during large open house celebrations. See Albertini, 472 U.S. at 687, 105 S.Ct. at 2905. Indeed, General Welch indicated that if the Air Force were required to provide equal access "to any political group desirous of projecting its views upon those taking part in the 'Open House' celebration, the additional security requirement and politicization of the 'Open House' would probably cause a fundamental reevaluation of the rationale for holding an 'Open House' at all." R. Vol. I, Doc. 9, Tab 3, p 11 (Declaration of General Larry D. Welch); see also R. Vol. II at 1-35, 1-36.
 
 
 48
 In sum, we conclude that Peterson AFB was not a public forum during the 1985 and 1986 open house celebrations and that the restrictions on plaintiffs' speech were reasonable and viewpoint neutral.[10] Therefore, we REVERSE the district court's July 20, 1988 judgment.
 
 JOHN P. MOORE, Circuit Judge, dissenting:
 
 49
 I must respectfully dissent from that portion of part II of the court's opinion dealing with the public forum issue. I agree with the court's general postulates, but I cannot concur with the conclusion the district court erred in holding Peterson Air Force Base was converted to a public forum at the time of the open house. To the contrary, I believe the district court correctly analyzed the facts and appropriately applied the law to those facts.
 
 
 50
 The basis for my disagreement here is the majority's failure to appreciate the significance of the broad range of activities the base commander permitted at the open house. The court has focused upon Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), and United States v. Albertini, 472 U.S. 675, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985), and concluded the military does not convert a base into a public forum by the simple act of conducting an open house during which the general public is permitted access to an otherwise closed facility. As a general proposition, that is an accurate assessment of the present law. That statement, however, overlooks an important factual distinction present in this case.
 
 
 51
 The district court found, as a matter of fact, the base commander did more than open the doors of Peterson Air Force Base to public visitation. As noted by the court, other "activities" were conducted during that time that were foreign to the purpose of the open house.
 
 
 52
 According to the record, the Air Force Chief of Staff has taken the position that the purpose of an Air Force open house is to "provide the vital link of public awareness that is so important to the federal military forces in a democracy; ... to ensure that the public is well-informed concerning the military forces their tax dollars help to support." Brown v. Palmer, 689 F.Supp. 1045, 1048 (D.Colo.1988). Historically, open houses have "centered around static displays of current and historic Air Force aircraft, displays and information concerning weapons carried on the aircraft, and 'air shows.' " Id. Traditionally, the public has been invited to air bases to "observe the various displays and events, and ask questions of the hosting military unit about their role in the defense of our country." Id. Open houses are conducted to "foster good relations with the surrounding civilian community." Id.
 
 
 53
 In my judgment, none of these objectives are accomplished by allowing civilians to advertise nature walks, plastic molders' societies, religious material, and invitations to religious activities. These civilian pursuits are so foreign to the military objectives of the open house they compel the conclusion the military has intended to create a public forum.
 
 
 54
 In this instance, the base was not only opened to the public, but it was also open to diverse members of the public who were permitted to advertise and present essentially private materials of their own interest to the public. The only difference between what those civilians did and what the plaintiffs did was the political content of the plaintiffs' leaflets.
 
 
 55
 I believe there is no logical conclusion other than that reached by the district court. Moreover, I do not believe the cases relied upon by this court support reversal of that conclusion.
 
 
 56
 In none of the cases, beginning with Greer, did the military authority permit the base to be used by civilians for their private pursuits. In Greer, for example, an open house was not even involved, but the plaintiff wanted to enter the base to hold a political rally. Greer is not helpful because the base commander did not choose between private groups who were permitted to bring their messages to the visiting public. Indeed, I would have no trouble reading Greer to say that if the base commander had permitted others to conduct a rally, he could not have denied Dr. Spock the same right.
 
 
 57
 In Albertini, the Court did not decide whether the base became a public forum. Instead, it proceeded to address the First Amendment question premised on the reasonableness of enforcing a bar order issued because of the defendant's prior criminal activity.
 
 
 58
 I do not believe the simple act of opening a military base to public visitation results in a surrender of the military's right to control the conduct of the public who responds to the invitation. When, however, the military grants some private individuals the right to address the visiting public on issues having nothing to do with the military objective of the open house, the military has created a public forum. Having done so, the military cannot then exclude others from the exercise of their rights to free speech just because the military does not agree with the political content of their message.
 
 
 59
 In this context, it makes no difference to me that the military did not intend to open the base to political speech. Those in charge unwittingly surrendered their right to regulate the conduct of the plaintiffs simply by granting other civilians the right to speak on subjects of their own choosing during the course of an otherwise military event. Having done so, the First Amendment does not permit the base commander to exclude others who wish to exercise the same right.
 
 
 60
 Indeed, the fact that some were permitted access to the base while the plaintiffs were denied the same right is what makes United States v. Kokinda, --- U.S. ----, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990), inapposite. In Kokinda, the issue was whether a sidewalk in front of a post office is a public forum. The case did not confront the distinguishing double standard issue we face here. Thus, the quote from Cornelius v. NAACP Legal Defense and Educ. Fund, 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985) ("[t]he government does not create a public forum by ... permitting limited discourse"), relied upon by the Kokinda Court and the majority here, must be put in context. The "limited discourse" to which the Kokinda Court referred was activity which took place at another time and not the double standard conduct that occurred in this case. In short, Kokinda in no way undercuts the notion that the government cannot create a public forum for some and deny the same forum to others solely upon the content of the speech of those excluded.
 
 
 61
 For the same reason, I believe Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), is also inapplicable. The issue in Perry was whether in the collective bargaining agreement a school district could grant an exclusive bargaining agent access to teachers' mailboxes and still deny the same access to another union. Id. at 44, 103 S.Ct. at 954. Here again, the case did not deal with the issue before us. The Perry Court was not concerned with whether a governmental authority granted diverse groups access to an otherwise nonpublic forum. Indeed, the Court held the school district had not opened its mailboxes to "indiscriminate use by the general public." Id. at 47, 103 S.Ct. at 956. Thus, the contract granting the recognized bargaining agent access did not change the mailboxes into public fora. "We believe it is more accurate to characterize the access policy as based on the status of the respective unions rather than their views." Id. at 49, 103 S.Ct. at 957. No similar characterization could be made between the diverse groups granted or denied access in this case. Indeed, they all enjoyed the same status in the eyes of the Air Force.
 
 
 62
 Ultimately, it is not whether Peterson Air Force Base is a public forum, but rather whether the acts of the base commander converted it into a public forum on the day of the open house. With all due respect, I do not believe it is the district court's emphasis that is "misplaced." I would affirm.
 
 Order
 Nov. 6, 1990
 
 63
 Before: HOLLOWAY, Chief Judge and McKAY, LOGAN, SEYMOUR, MOORE, ANDERSON, TACHA, BALDOCK, BRORBY and EBEL, Circuit Judges.
 
 
 64
 Appellee's petition for rehearing and suggestion for rehearing en banc is granted. Within thirty days of the date of this order, the parties may file supplemental briefs, not to exceed twenty pages.
 
 
 65
 This case will be set on the next available calendar for argument to the court en banc.
 
 
 
 [1]
 Section 1382 provides:
 Whoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation; or
 Whoever reenters or is found within any such reservation, post, fort, arsenal, yard, station, or installation, after having been removed therefrom or ordered not to reenter by any officer or person in command or charge thereof--
 Shall be fined not more than $500 or imprisoned not more than six months, or both.
 
 
 [2]
 Federal Rule of Appellate Procedure 3(c) provides that a notice of appeal "shall specify the party or parties taking the appeal." In 1979, the rule was amended to add that "[a]n appeal shall not be dismissed for informality of form or title of the notice of appeal."
 
 
 [3]
 We need not decide whether the appeal is valid with regard to Colonel Cullinane because the designation of either one of the defendants perfected the appeal by the United States
 
 
 [4]
 Private parties must file their notice of appeal within thirty days after the date of the entry of the judgment or order from which appeal is taken. Fed.R.App.P. 4(a)(1)
 
 
 [5]
 Courts of appeal have also been extremely reluctant to find that a military base is a public forum. See Shopco Distribution Co. v. Commanding General, 885 F.2d 167, 172-73 (4th Cir.1989); United States v. McCoy, 866 F.2d 826, 832-34 (6th Cir.1989); M.N.C. of Hinesville, Inc. v. United States Dept. of Defense, 791 F.2d 1466, 1472-74 (11th Cir.1986); Persons for Free Speech at SAC v. United States Air Force, 675 F.2d 1010, 1015-18 (8th Cir.) (en banc), cert. denied, 459 U.S. 1092, 103 S.Ct. 579, 74 L.Ed.2d 939 (1982) (an open house is not such a deviation from the historic and traditional uses of a military base so as to create a public forum)
 
 
 [6]
 The Court in Albertini went on to hold that, regardless of whether Hickam Air Force Base was a public forum during the open house, the activist's First Amendment rights were not violated. The Court stated that the military, which had a valid interest in maintaining security at the base, had reasonable grounds for excluding the activist because he previously had been issued a valid bar letter for destroying government documents. Albertini, 472 U.S. at 687, 105 S.Ct. at 2905
 
 
 [7]
 The Supreme Court has made clear that the public-forum question depends on the intent of the government and that even if public property is compatible with expressive activity, such property cannot be transformed into a designated public forum if it would be contrary to the government's intent. See Cornelius, 473 U.S. at 821, 105 S.Ct. at 3459; Albertini, 472 U.S. at 686, 105 S.Ct. at 2905; see also Barnard v. Chamberlain, 897 F.2d 1059, 1064 (10th Cir.1990)
 
 
 [8]
 Although military contractors participated in the open house celebrations, nothing in the record indicates that the contractors were distributing any ideological messages advocating war or concerning the proper political role of the military. The record suggests that the military contractors only distributed information about weapons that the Air Force was currently using. See R. Vol. II at 1-28; see also R. Vol. I, Doc. 8, Exhibit C. Any pro-military message that the contractors may have implicitly conveyed would not justify a finding of viewpoint discrimination. Cf. Persons for Free Speech, 675 F.2d at 1019 (finding no Equal Protection Clause violation where the military excluded anti-military demonstrators from participating in an open house celebration but permitted defense contractors to distribute information at the open house because the information distributed concerned only aircraft and weapons systems that were currently in use)
 
 
 [9]
 Plaintiffs' brochures argue the undesirability of war. However, there is no evidence that suggests that the military ever intended to open up that subject to debate during the open house. As pointed out elsewhere, the political and ideological issues of whether, and when, to wage war are issues that the Air Force assiduously avoided
 
 
 [10]
 Amicus curiae American Civil Liberties Union of Colorado makes the additional argument that the bar letters should be invalidated because plaintiffs were not notified that their leafletting would not be permitted. However, the bar letters were issued only after plaintiffs refused the Air Force's request to either cease leafletting or leave the base. R. Vol. I, Doc. 8, pp 6, 7 (Stipulation of Agreed Facts). Therefore, we believe that plaintiffs received adequate notice